Keating, J.
Victor E. Letendre owned a gas station and motel in Malta (near Saratoga Springs), New York. In September of 1962, he left for Florida, where he operated a restaurant, leaving behind, in complete charge of his New York enterprise, one James J. Tremblay. Tremblay was a relatively new employee. Before departing, Letendre secured a fidelity bond on Tremblay in the sum of $5,000 from the Hartford Accident and Indemnity Company, the appellant here.[1]
In late May, 1963, Letendre returned to Malta. In examining the business records for the period of his absence, he soon discovered serious discrepancies in the records and inventory as well as apparent shortages in the bank accounts of his *521 business. He promptly reported the loss to appellant’s claim agent, to whom he also turned over Ms papers.
On June 12, 1963 Tremblay went to the agent’s office where he signed a statement in wMch he denied stealing any money or falsifying records. He attributed the shortages to either poor management or poor mathematics or both. A week later, Tremblay gave a second statement to the agent. Again he demed any wrongdoing, but now stated that he could offer no explanation for the missing money.
On July 9, 1963 Tremblay gave still another statement to the appellant’s agent; this time, however, he incriminated himself by confessing to a defalcation of at least $5,000. During this period Tremblay had continued to work for Letendre, but without pay, in order .to make good the loss. Following this third statement, Tremblay was discharged on July 18.
Fifteen days later Tremblay gave the last of this series of exculpatory and inculpatory explanations for the loss. On this occasion, Tremblay retracted his earlier statements. Even so, he acknowledged having stolen money, but he avowed that the limit of Ms peculations was the paltry sum of $400. His guilty admissions in the statement of July 9, Tremblay stated, were motivated by a sense of responsibility for his employer’s loss. He had been charged with the duty of overseeing the operations of the station and the loss, he felt, had occurred because of his carelessness.
At the trial, Tremblay, whom plaintiff had subpoenaed, denied having embezzled any funds whatsoever. To recover against the insurer, plaintiff had to prove that his losses were aseribable to Tremblay’s misconduct. On this issue, plaintiff’s proof, apart from the incriminating statements of July 9 and August 2, was deficient. Tremblay did not in fact control the cash receipts or oversee the business records. The other employees had many opportunities to steal. It is evident, therefore, that without these two statements, which were taken by the insurer’s representative during the course of its investigation, no verdict for the plaintiff could be sustained.
Faced with the prospect of ultimate dismissal of Ms action for insufficiency of proof on the issue of defalcation, plaintiff offered in. evidence Tremblay’s two inculpatory statements, and they were received. Appellant’s trial counsel made timely and *522 proper objections upon the ground that under the rule of Hatch v. Elkins (65 N. Y. 489 [1875]) the extrajudicial declarations of a principal (Tremblay), made after the acts to which they relate, are not competent evidence against the surety (Hartford). Since the July 9 statement was made months after the defalcation, it would not have been admissible under the Hatch rule. In the trial court, Letendre recovered the full amount of the bond and the Appellate Division has affirmed. (27 A D 2d 205.) We granted leave. (19 N Y 2d 583.)
We agree with both courts below that Tremblay’s statements were properly received. However, we do not view Hatch v. Elkins (supra) as distinguishable. Therefore, to the extent that the Hatch rule would require a contrary result, we reject it as unsound in principle and without support as a matter of both policy and justice. We see no reason to limit admissibility to res gestae statements and to exclude this obviously relevant and probative evidence.
We also agree with the Appellate Division that the admissibility of these inculpatory statements should not be dependent upon whether the employment relationship had terminated. (27 A D 2d, supra, p. 206.) Nor should the fact that the bond was no longer in effect at the time the statements were given be determinative. Making the admissibility of the statements turn on such circumstances would only introduce additional, hypertechnical distinctions which would serve no purpose. In an action by an employer to recover on a fidelity bond, an extrajudicial declaration made by his employee should be admissible as affirmative evidence against the surety, where the declaration is in writing and the declarant is available for purposes of cross-examination.
The primary policy reason for the rule of Hatch v. Elkins (supra) is the fear of collusion between the employer and his principal against the surety. The danger is certainly a real one, but this should not make the statements excludable. Every day in our trial courts, juries are called upon to determine whether particular evidence is tainted by collusion.
The danger of collusion is no greater here than in a personal injury action arising out of an automobile accident where the driver and the injured party are relatives or close friends. Yet, the Legislature has not thought it necessary for New York *523 to have a guest statute to prevent fraudulent claims against insurance companies. (See Babcock v. Jackson, 12 N Y 2d 473, 482-483.)
In reality, the risk of collusion is considerably less in a case like this than in the ordinary negligence suit. An extrajudicial admission .of fault by a defendant driver always constitutes evidence in chief, despite the fact that the real party in interest is almost always an insurance company. A defendant in a negligence action hazards virtually nothing by making an admission, whereas the employee in an action on a fidelity bond risks jail by his admission of embezzlement. It is not likely that he would admit to a theft merely to accommodate his employer.
The Hatch rule works a gross injustice by depriving an employer of what may be the only substantial evidence he has and consequently may make it almost impossible in many cases—as in this one—for him to prove a case. Often the only evidence connecting the loss to the dishonesty of an employee may be the inculpatory statements thereafter made by the employee after the loss is discovered.
Moreover, the present rule offers no substantial protection to the surety from fraudulent claims. It would be a rather simple matter for an employer, willing to engage in a conspiracy to defraud an insurance company, to manufacture sufficient fraudulent evidence to make out a prima facie case even under the rule of Hatch v. Elkins (supra). On the other hand, the honest employer, who has been the victim of possibly ruinous fraud by an employee, may face an insurmountable problem of proof under the present rule.
The injustice of the existing rule is well illustrated by the facts of the present case. The possibility of collusion here was minimal. Hartford took complete charge of the investigations. Plaintiff’s books and records were turned over to it. All of Tremblay’s statements were obtained by Hartford’s agents. The key statement of July 9, 1963 was taken from Tremblay only after he had been expressly warned that the confession might be used in subsequent criminal proceedings against him.
It might well be that Tremblay made the incriminating statements under pressure in order to protect his brother, who also worked at the station. But this is a motivation which could *524 lead any witness in almost any ease to swear falsely. Nevertheless, no one would contend that, whenever the evidence indicates that a witness may be attempting to shield another, his testimony should be excluded. This is a matter for the fact-finder to weigh in making its determination. Likewise, the probative value of Tremblay’s confessions was properly submitted to the jury for its evaluation.
Admittedly, Tremblay’s statements were hearsay. Nevertheless, none of the classic dangers, which justify the hearsay rule, are present in this case. Hence, a departure from the general rule excluding hearsay evidence is proper here.
Declarant himself was present in court, subject to the oath and the safeguard of cross-examination. (See 5 Wigmore, Evidence [3d ed.], §'§ 1361-1363; McCormick, Evidence, pp. 457-459.) The jury had ample opportunity to assess his credibility. Also the declaration was in writing and was taken by the appellant’s agent. Thus there was no risk that Tremblay’s words would be incorrectly reported.
Furthermore, the justification for the exception we create here is far stronger than that which supports many of the existing exceptions to the hearsay rule, where there is no opportunity for cross-examination. Had Tremblay died or disappeared, his statements would have been admissible as a declaration against interest since the statements were against Tremblay’s pecuniary interest as well as his penal interest. (Kittredge v. Grannis, 244 N. Y. 168; Richardson, Evidence [9th ed., Prince], § 240.)
It is significant to note that, under the Model Code of Evidence as well as under almost every major proposal for reform of the law of evidence, Tremblay’s statements would be admissible as evidence in chief. (Model Code of Evidence, rule 503; see, also, Uniform Rules of Evidence, rule 63, subd. [1]; Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv. L. Rev. 177, 192-196; Weinstein, Probative Force of Hearsay, 46 Iowa L. Rev. 331; 3 Wigmore, Evidence [3d ed.], § 1018.)
Although special cautionary instructions concerning the fact that Tremblay was not under oath when he made the statements would have been appropriate, the omission does not warrant a reversal here. It has never been the rule that a court must *525 always instruct the jury when hearsay evidence is admitted although in certain cases—as, for example, when dying declarations are admitted—special instructions may be required (People v. Mleczko, 298 N. Y. 153).
Often hearsay evidence has far more probative value than testimonial evidence. There was nothing in Tremblay’s statements or in the circumstances under which they were given which made them less reliable than his testimony in court. The trial court here charged the jury to weigh carefully all the evidence, both testimonial and documentary, to sift it, to harmonize the discrepancies, if possible, and, when unable to do so, to decide where the truth lay.
In reaching our conclusion, we have adhered to the views expressed by Chief Judge Fuld in his concurring opinion in Fleury v. Edwards (14 N Y 2d 334, 341): “ The common law of evidence is constantly being refashioned by the courts of this and other, jurisdictions to meet the demands of modern litigation. Exceptions to the hearsay rules are being broadened and created where necessary. [Citations.] Absent some strong public policy or a clear act of pre-emption by the Legislature, rules of evidence should be fashioned to further, not frustrate, the truth-finding function of the courts in civil cases.”
The order should be affirmed, with costs.

. At the present time, fidelity bonds generally involve a two-party contract between the employer and the insurer, whereas, in the early days of this form of underwriting, the employee would have to seek his own surety. It would, therefore, seem more appropriate to describe the bond as a fidelity insurance policy.