**TRADE DEVELOPMENT BANK,**
**Plaintiff-Appellee,**

v.

**The CONTINENTAL INSURANCE COM-**
**PANY, Defendant-Appellant.**

**No. 811, Docket 72–1189.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 16, 1972.

Decided Oct. 10, 1972.

Jack Hart, New York City (Hart & Hume, William Hart, New York City, of counsel), for defendant-appellant.

Charles C. Parlin, Jr., New York City (Shearman & Sterling, Leo Kayser, III, J. Ernest Baird, New York City, of counsel), for plaintiff-appellee.

Before MANSFIELD and TIMBERS, Circuit Judges, and GURFEIN, District Judge.*

MANSFIELD, Circuit Judge:

Invoking diversity jurisdiction, Trade Development Bank (the "Bank" herein), a Swiss bank, sued The Continental Insurance Company (the "Insurer" herein) upon a fidelity bond for recovery of losses due to dishonesty on the part of the Bank's employees. The fidelity bond, issued by the Insurer in 1968, obligated it to indemnify the Bank up to the sum of $5,000,000 against

> "Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of any of the Employees."

In a trial before Judge Pollack the jury awarded the Bank damages in the sum of $2,045,932, to which prejudgment interest in the sum of $171,205 was added. The Insurer appeals from the judgment in the total amount of $2,217,137, entered on December 27, 1971, and from the district court's denial of its post-trial motion, claiming that errors on the part of the trial judge, principally in his evidentiary rulings, entitle it to a new trial. We affirm.

The evidence, viewed in the light most favorable to the Bank, reveals that from mid-1969 to April 1970 the Manager of the Securities Department of the Bank's branch in Chiasso, Switzerland, Louis Gerard Salerian, fraudulently used funds of the Bank and of its customers to engage in a series of unauthorized securities transactions with a view to keeping any profits for himself. Unfortunately for him and for the Bank and its customers his talents apparently did not lie in securities investment, for he selected for these fraudulent transactions a series of stocks which declined sharply (e.g., I.O.S. Management, Ltd. and Four Seasons Nursing Homes), resulting in a loss of over $2,000,000 of the Bank's funds.

Perpetration of such a colossal fraud by Salerian was possible because Swiss banks not only offer their customers the usual services performed by banks in this country but are also permitted to act as stockbrokers. As the Manager of the Securities Department of the Bank's Chiasso branch, Salerian was authorized to execute customers' orders by buying and selling securities through other banks and brokerage firms, to carry out arbitrage transactions and, with the branch Manager's prior approval, to trade for the branch's own account. Without any authority from the management or any knowledge on its part, however, he made hundreds of purchases of securities, using the Bank's funds. Although the Bank maintained a typically detailed record-keeping system for authorized securities transactions, these purchases were either not registered on the Bank's records at all or they were falsely entered.

When the market value of some of the securities dropped sharply Salerian, afraid that the decline would continue, sold many of the securities at heavy losses. In order to conceal his fraud and the resulting losses, he made hundreds of false and irregular entries in various customers' accounts. In many instances he entered unauthorized transactions in customers' accounts long after they had taken place, even though authorized purchases and sales would have been recorded within a few days. The devices used by Salerian to mask his fraudulent activities and resulting losses were many and varied. They included the recording of fictitious transactions on the Bank's records, the recording of real transactions at fictitious prices, the allocation of transactions to various customers' accounts long after the event at prices different from the actual transaction prices, the transmittal to customers

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

of false valuations of their securities portfolios, and the making of fictitious entries in the Bank's internal records of its accounts with other banks.

In the fall of 1969 Giorgio Camponovo, the Assistant Manager of the Bank's Chiasso branch, who was Salerian's immediate supervisor, discovered in the Bank's internal records some of Salerian's fictitious entries with respect to transactions in I.O.S. When he called the discrepancies to Salerian's attention, the latter confided that he had lost some $200,000 as a result of his transactions but assured Camponovo that the loss would be absorbed over the next few months by customers who had benefited in the past from similar operations. Instead of reporting Salerian's dishonesty to Albert Benezra, then the Manager of the Chiasso branch, Camponovo remained silent.

Salerian's fraud, and Camponovo's complicity in it, were finally discovered by the Bank's management in April 1970. In the course of a sharp stock market drop in the first quarter of 1970, in which I.O.S. Management shares were hard hit, the Bank's management, located at the head office in Geneva, investigated a rumor that its Chiasso branch owned a large block of I.O.S. stock. Upon checking Chiasso customers' files the new Manager of the Chiasso branch, Albert Benezra, discovered suspicious entries. He then confronted Salerian and Camponovo, both of whom confessed in a series of statements given between April 20 and 24, 1970. Although Salerian first stated that the current loss was only $30,000, he gradually furnished more information with respect to his fraudulent activities, which indicated the total loss to be many times that amount. In handwritten statements dated April 20 and 24, 1970, Salerian summarized his dishonesty as follows:

"I hereby declare that from July 1969 to August 1969, without having been authorized by the Management, I maintained a securities position on 7000 IOS Management shares, the purchase price for which was $70 per share.

"As the security dropped between $38 and $40 and being afraid that there would be a further drop, I proceeded to liquidate this position by selling off these same securities at prices ranging from $38 to $40.

"Inasmuch as I did not want to cause the Bank to sustain such a sizeable loss, panic-stricken, I debited the accounts of clients, a list of which is attached hereto, with different amounts representing the counter-value of the IOS stock, so as to compensate for the amount lost on the 7000 shares." (Confession dated April 20, 1970.)

"I hereby declare that I kept these statements in my own hands for the following purpose: that if the market declined, I would enter them into the Bank's account, and if the market rose, I would keep them for my own account.

"I acknowledge that everything that I kept in a suspense account was for the same use.

"I acted without anyone's authorization, and was full [sic] aware that I did not have the right to do so." (Confession dated April 24, 1970.)

The Insurer was promptly notified. It conducted its own investigation. Two outside auditing firms (Peat Marwick & Fides S.A. and Societe Fiduciaire Romande Ofor S.A.) were retained by the Bank to review and straighten out the records. Their reports, which were completed in August 1970, confirmed generally that Salerian had made fraudulent securities transactions and false entries concealing them. Copies of the reports were promptly furnished to the Insurer, and the Bank also notified customers whose accounts had been falsified. These customers then filed claims against the Bank for losses suffered by reason of Salerian's fraudulent activities. The claims were subsequently settled by the Bank's payment of $819,520

after the Insurer declined an offer to assist in handling threatened litigation and to participate in the settlement negotiations. This lawsuit followed.

■ At trial the Insurer did not seriously dispute Salerian's dishonesty. Its principal defense was that the Manager of the Chiasso branch, Albert Benezra, had learned or should have learned of Salerian's conduct many months prior to April 1970 but had failed to avert the loss or to give timely notice to the Insurer as required by the fidelity bond.[1] However, Benezra testified at trial that he had no knowledge of Salerian's fraud until April 20, 1970. The issue was submitted to the jury, which resolved it against the Insurer. The jury's verdict, being supported by substantial evidence, must stand in the absence of error warranting reversal. The Insurer further contended that it was not responsible for losses arising out of securities transactions allocated by Salerian to certain customers' accounts because the transactions had been authorized or tacitly consented to by those customers, either personally or through their representative, one Angelo Luzzani. This defense was also argued to the jury, which resolved it against the Insurer by including in its verdict an award for these losses.

### The Refusal to Order Disclosure of the Identity of the Swiss Bank's Customers

The Insurer contends on appeal that the trial judge committed several errors requiring reversal. The first of these is the district court's refusal to order the Bank to disclose the identity of customers whose accounts were misused by Salerian to conceal his fraudulent transactions by use of false entries. In the course of pretrial disclosure and depositions the Bank furnished to the Insurer thousands of records in its possession or control which were requested by the Insurer's counsel as possibly relevant to the issues, including transcripts of customers' accounts, auditors' work sheets, brokers' slips and Bank records underlying the alleged fraudulent transactions. It refused to furnish the identity of customers, however, on the ground that to do so would violate the Swiss bank secrecy law, § 47(b) of the Swiss Federal Bank Act, a criminal statute which provides that a violation shall be punishable by a fine of up to 50,000 francs or by imprisonment up to six months, or by

---

1. The pertinent provisions of the bond were as follows:

    "Loss—Notice—Proof—Legal Proceedings

    "Section 3. At the earliest practicable moment after discovery of any loss hereunder the Insured shall give the Underwriter written notice thereof and shall also within six months after such discovery furnish to the Underwriter affirmative proof of loss with full particulars. Legal proceedings for recovery of any loss hereunder shall not be brought prior to the expiration of sixty days after such proof of loss is filed with the Underwriter nor after the expiration of twenty-four months from the discovery of such loss, except that any action or proceeding to recover hereunder on account of any judgment against the Insured in any suit mentioned in the Clause entitled Court Costs and Attorneys' Fees, or to recover attorneys' fees paid in any such suit, shall be begun within twenty-four

months from the date upon which the judgment in such suit shall become final. If any limitation embodied in this bond is prohibited by any law controlling the construction hereof, such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

    \*     \*     \*     \*     \*

    "Termination or Cancelation
    "Section 10. . . .
    "This bond shall be deemed terminated or canceled as to any Employee (a) as soon as the Insured shall learn of any dishonest or fraudulent act on the part of such Employee without prejudice to the loss of any property then in transit in the custody of such Employee, or (b) fifteen days after the receipt by the Insured of a written notice from the Underwriter of its desire to terminate or cancel the bond as to such Employee."

both.[2] In pretrial proceedings Judge Pollack upheld the Bank's position on the ground that there was "neither compelling necessity for this information nor potential prejudice to defendant from nondisclosure at this stage of the proceedings," since the transcripts of the customers' accounts and the other records giving details as to the transactions about which the Insurer had inquired were adequate to enable it to prepare for trial.

At trial the parties took issue as to whether the Swiss bank secrecy law did bar disclosure of the customers' identities in a trial in a federal court in New York, with both sides offering testimony of Swiss law experts on the subject. Judge Pollack concluded that the Swiss law did prohibit such disclosure and decided that as a matter of comity he would therefore not require the Bank to identify the customers whose accounts were involved, particularly since in his view the identity was not essential to the issue on trial, which was whether securities transactions had been entered by Salerian in certain customers' accounts in furtherance of his fraudulent scheme. He ruled:

"But whether the account is known as x or 8044 or John Jones has nothing at all to do with whether the bonded employee has stolen something or acted dishonestly or fraudulently in connection with that account. The identity of that person is not a relevant issue in the case."

■ On the basis of our reivew *de novo* of the expert testimony and authorities offered by the parties, we are satisfied that the criminal sanctions of Article 47(b) of the Swiss Federal Bank Act apply to the disclosures sought in this proceeding. On its face the statute is Delphian in its generality. It simply provides that any bank officer or employee who violates the "duty of secrecy" or reveals a professional secret entrusted to him is punishable. However, the preponderance of opinion, given in testimony by well qualified Swiss law experts, was unequivocally to the effect that disclosure by the Bank, even at the direction of the United States District Court, would constitute a violation of the law. The principal bank secrecy issue at trial was whether Article 204 of the Code of Civil Procedure in the Swiss Canton of Ticino (where the Bank's Chiasso branch is located) superseded Article 47(b) of the Swiss Federal Bank Act. Article 204, as part of the procedural code of Ticino, enumerates the persons entitled to refuse testimony on the ground of professional secrecy (e.g., priests, lawyers, doctors) but does not include bankers. Although there is strong support for the view that such a procedural rule of a Swiss canton overrules the Swiss Federal Bank Act in a proceeding in the Canton itself, Mueller, The Swiss Banking Secret From a Legal View, 18 Int. & Comp.L.Q. 360, 366–67 (1969); Meyer, The Banking Secret and Economic Espionage in Switzerland, 23 Geo.Wash.L.Rev. 284, 292 (1955), all experts at trial agreed that it would not apply to a proceeding in a United States court.

■ There remains the question of whether the district court erred in not ordering the Bank, assuming its disclosure of customers' names would violate § 47(b) of the Swiss Federal Bank Act, to make a good faith effort to obtain a waiver of that restriction from the customers involved. Unquestionably the

2. Article 47(b) of the Swiss Federal Bank Act of November 8, 1934, which was in effect at all relevant times, provides:
"Anyone who in his capacity as an officer or employee of a bank, or as an auditor or his employee, or as a member of the banking commission or as an officer or employee of its bureau intentionally violates his duty to observe silence or his professional rule of secrecy or anyone who induces or attempts to induce a person to commit any such offence, shall be liable to a fine of up to 50,000 francs or imprisonment for up to six months, or both.
"If the offender acted with negligence he shall be liable to a fine up to 30,000 francs."

court had the power to do so, see, e.g., Societe Internationale, etc. v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958), and that power might appropriately have been exercised in a case such as this, where a foreign domiciliary seeking to avail itself of the processes of our courts to enforce its claim invokes the law of its country as the basis for non-disclosure.[3] However, although the idea of seeking waivers was mentioned in the course of pretrial depositions (Benezra, p. 180), the Insurer never asked the court for an order directing the Bank to seek waivers from clients whose accounts had allegedly been misused. Under the circumstances the district court was entitled in its discretion, after balancing the interests involved, to defer to Swiss law, Societe Internationale, etc. v. Rogers, *supra*, at 213, 78 S.Ct. 1087; United States v. First National City Bank, 396 F.2d 897, 901 (2d Cir.1968); Restatement (Second) of the Foreign Relations Law of the United States § 40 (1965), and to define the scope of pretrial disclosure, In re Surety Ass'n of America, 388 F.2d 412, 414 (2d Cir. 1967). In addition to the factors that ordinarily must be considered by the court in deciding whether to order a disclosure prohibited by the law of another state (e.g., the effect on the national interests of the states affected, the nationality of the party against whom disclosure is sought, and the extent to which the court's order can expect to be enforced), the relative unimportance of the information as to the clients' identity in the present proceeding was entitled to be considered.

Upon the record before us we fail to find any abuse of discretion on the part of Judge Pollack, who has had more than the usual degree of experience in this particular field[4] and who lived at length with this case, which was assigned to him for all purposes,[5] in not ordering the Bank to seek waivers. Salerian's falsification of the Bank's records is not disputed. All records falsified by him were made available, except for the names of customers, to the Insurer. It is unlikely that the customers would have furnished evidence helpful to the Insurer. Indeed, they were claiming through their representative Dr. Angelo Luzzani to have been victimized by Salerian's fraud. Although the Insurer contended that Dr. Luzzani, whose identity was known to it, had acted as the authorized agent for approximately 18 of the customers in giving instructions to Salerian with respect to

---

3. Since the Swiss bank secrecy law was enacted primarily to protect the right of privacy of clients, the client is the "master of the secret," Mueller, The Swiss Banking Secret, *supra*, at 363; Meyer, The Banking Secret, *supra*, at 293. With the client's consent the bank may of course reveal the client's identity without violating § 47(b). Here the Bank, on October 19, 1971, agreed to pay $772,600 in settlement of claims asserted by 18 numbered accounts because of Salerian's fraud. Since the Insurer had previously demanded the identity of the clients, the district court, had a timely request been made by the Insurer, could have directed the Bank to obtain waivers at the time of settlement. Apprehension on the part of the Bank's clients that the information as to their identities would be misused could have been minimized by a protective order prohibiting the parties from disclosing the information to third persons or using it for any purpose other than the pending suit.

4. After an evidentiary hearing and thorough investigation Judge Pollack in a reasoned opinion concluded in United States v. First National City Bank, *supra*, that the First National City Bank had failed to present a legally sufficient reason for failure to comply with a subpoena duces tecum calling for production of documents protected from disclosure by bank secrecy laws of West Germany. His decision adjudging the bank in contempt was affirmed, 396 F.2d 897 (2d Cir. 1968).

5. The trial judge held a series of pretrial hearings in which he made numerous rulings that demonstrated a thorough grasp of the background and issues. In addition he presided at the 10-day trial in which he was called upon, among other things, to give essential instructions to the jury.

purchase and sale of securities for their accounts, it failed to depose him or to offer him as a witness at trial. In short, no sound basis is offered for disturbing the trial judge's exercise of discretion, which appears to have been based on a careful analysis and balancing of all relevant interests.

### The Proof of Damages

█ The Insurer next contends that the judgment should be set aside for the reason that there was a failure of proof of damages. We disagree. The Bank introduced extensive documentary and oral proof of nine different categories of loss suffered by it as a result of Salerian's dishonesty, including damages suffered by reason of his use of Bank money to make unauthorized purchases or short sales of securities later disposed of at a net loss, funds paid to independent auditors to straighten out the Bank's books following Salerian's falsification of them, losses resulting from unauthorized purchases of securities which Salerian fraudulently allocated to customers, and payments made by the Bank in settlement of customers' claims based on Salerian's conduct. While the tangled affairs of Salerian did not lend themselves to easy reconstruction, the schedules offered by the Bank were founded on record evidence. Thus there was ample evidence to support by a fair preponderance the finding that the Bank suffered losses in the sum of $2,045,932 (before interest) by reason of Salerian's dishonesty, and the Insurer, except to the extent of its cross-examination of witnesses offered by the Bank, failed to introduce any contrary schedule or analysis of the financial records.

### The Exclusion of Salerian's Exculpatory Statements

█ A more serious question is posed by the Insurer's contention that the trial judge erred in excluding a seven-page written exculpatory statement made by Salerian on October 28, 1970, more than six months after the series of written confessions given by him in April 1970.

Although his earlier confessions were hearsay, they were properly admitted in evidence under the well-recognized exception made for declarations aginst interest. Oscar Gruss & Son v. Lumbermens Mut. Cas. Co., 422 F.2d 1278, 1282–1283 (2d Cir. 1970); Gichner v. Antonio Troiano Tile & Marble Co., 133 U.S. App.D.C. 250, 410 F.2d 238, 241–243 (1969); Alexander Grant's Sons v. Phoenix Assur. Co., 25 A.D.2d 93, 267 N.Y.S.2d 220 (4th Dept. 1966). See generally C. McCormick, Evidence Ch. 27 (2d ed. 1972). Indeed it is difficult to conceive of a better qualified "declaration against interest" than these confessions, which satisfy all of the requirements for the admission of such declarations. Salerian's statements admitted participation in fraudulent and dishonest acts, were patently against his pecuniary and proprietary interest and exposed him to the risk of criminal prosecution; he does not appear to have had any motive to falsely incriminate himself, C. McCormick, Evidence § 279 (2d ed. 1972); and since he was outside the jurisdiction, his unavailability to testify at trial was not disputed. The Insurer contends that these self-incriminatory statements were obtained by threats on the part of superior Bank officials. This contention, however, is unsupported by any competent proof and it is illogical to assume that Salerian and Camponovo would have been induced by any such pressure to make self-incriminatory admissions that would obviously have jeopardized their careers and their liberty. On the contrary, if indeed they were innocent they would have had every reason to deny any wrongdoing. "It is not likely that [an employee] would admit to a theft merely to accommodate his employer." Oscar Gruss & Son v. Lumbermens Mut. Cas. Co., *supra,* 422 F.2d at 1283 (2d Cir. 1970) (quoting from Letendre v. Hartford Accident & Indemnity Co., 21 N.Y.2d 518 at 523, 289 N.Y.S.2d 183 at 187, 236 N.E.2d 467 at 469 (1968) ). But even accepting *arguendo* the Insurer's contention, the decision to admit the confessions as decla-

rations against interest rested within the trial court's discretion.

During the course of the trial the Insurer's counsel for the first time showed to counsel for the Bank two documents which were thereupon offered in evidence. The first was a seven-page typed narrative dated October 28, 1970, bearing Salerian's signature, addressed to the Swiss Examining Magistrate in charge of the investigation which followed the Bank's criminal complaint, still pending, against Salerian and Camponovo. The gist of this statement, which describes in confusing detail many securities transactions and false entries made by Salerian, is that the transactions were authorized by Angelo Luzzani as the attorney in fact for a group of customers, that the delayed entry on the Bank's books of sales of I.O. S. shares at a loss of approximately $420,000 was at the instance of Luzzani who did not wish to disclose the loss to his customers, that Camponovo agreed to this procedure, and that Benezra, the then Manager of the Chiasso branch, knew of and verified the transactions. The statement avers, among many other things, that Salerian's earlier confessions given in April 1970 were untrue and extorted from him by Bank officials "under threat of notifying the Police if I did not sign them." The second document was a one-page statement bearing Salerian's signature, dated November 20, 1971 (during the period when both parties were still actively engaged in taking depositions of various witnesses in Switzerland and only 23 days before the commencement of trial).

■ Since the two later Salerian statements were hearsay and the Insurer's counsel made no effort to justify their admission under an exception to the hearsay rule, the trial judge properly excluded them. The statements certainly could not qualify as admissions

against interest. Indeed, Salerian might reasonably be suspected of seeking, because of the intervening Swiss criminal investigation of himself, to place the blame on others.[6] The surrounding circumstances, including the Insurer's failure to notify the Bank prior to trial that it proposed to offer the statements, Salerian's apparent unwillingness to submit to cross-examination by the Bank's counsel, the impending criminal proceeding against Salerian in Switzerland, and the long delay in his furnishing the statements (one being given on the eve of trial), render them highly suspect.

■ The Insurer now urges for the first time on appeal that Salerian's subsequent statements, although hearsay, were admissible to impeach his earlier April 1970 confessions introduced into evidence by the Bank. Our attention has been directed to the rule, with which we do not disagree, that hearsay evidence may be received to impeach previously-admitted hearsay statements of an absent witness, and that since the witness is unavailable it is unnecessary in such a case to lay a foundation by first inquiring of the witness whether he made the statements. McConney v. United States, 421 F.2d 248, 251 (9th Cir. 1969), cert. denied, 400 U.S. 821, 91 S.Ct. 39, 27 L.Ed.2d 49, reh. denied, 400 U.S. 961, 91 S.Ct. 351, 27 L.Ed.2d 270 (1970); Bunge Corp. v. Manufacturers Hanover Trust Co., 65 Misc.2d 829, 318 N.Y.S.2d 819, 834 (N.Y. County), rev'd on other grounds, 37 A.D.2d 409, 325 N.Y.S.2d 983 (1st Dept. 1971); see People v. Conde, 16 A.D.2d 327, 228 N.Y.S.2d 69, 71–72 (3d Dept. 1962), aff'd., 13 N.Y.2d 939, 244 N.Y.S.2d 314, 194 N.E.2d 130 (1963); Martorella v. Prudential Ins. Co., 238 A.D. 532, 264 N.Y.S. 751, 753 (4th Dept. 1933), affd., 268 N.Y. 586, 198 N.E. 417 (1935); C. McCormick, *supra* § 37, at 74; 3A Wigmore, Evidence § 1033 (3d ed. 1940);

---

6. Indeed, even in the later statements Salerian does not portray himself as completely blameless. Their general tenor is that the principal culprit was Luzzani and that the Bank officials, in-

cluding Salerian, lent themselves to Luzzani's efforts to delay disclosure to his clients of his catastrophically poor investments and the resulting losses.

Prince, Admissibility of Contradictory Statements to Impeach Unavailable Witness; New York Rule, 10 Brooklyn L. Rev. 133 (1940). Had Salerian's subsequent statements amounted to nothing more than impeachment of his earlier confessions, it would have been reversible error to have excluded them, especially since the Bank's case depended heavily upon the confessions. The statements offered by the Insurer, however, went far beyond impeachment, retraction, or contradiction of the earlier confessions. For the most part they were devoted to a detailed history which, if believed, would implicate Benezra, Luzzani and Camponovo on the basis of their authorization or knowledge of the fraudulent transactions and thus show that the Bank failed to give timely notice of the wrongdoing to the Insurer. These portions, which constituted the major part of the documents, were properly excludable as hearsay.

■ Having presented the court with a "mixed-bag" or potpourri, most of which was inadmissible hearsay, the Insurer's counsel owed a duty to court and opposing counsel to point out or segregate those portions which might properly be offered as impeachment of Salerian's earlier confessions. Edward Valves, Inc. v. Cameron Iron Works, Inc., 286 F.2d 933, 939 (5th Cir. 1961); High Voltage Engineering Corp. v. Pierce, 359 F.2d 33, 39 (10th Cir. 1966). "[It] is for the proponent to sever the good and the bad parts," 1 Wigmore, *supra* § 17, at 320. See Rule 46, F.R.Civ. P. At the very least counsel should, when objection was properly taken, have informed the court of the purpose of the offer, especially when it had not furnished an advance copy to the Bank's counsel or advised it of the proposed offer. Bowman v. Kaufman, 387 F.2d 582, 588 (2d Cir. 1967). See 5A Moore, Federal Practice ¶ 46.02 (2d ed. 1971); Reck v. Pacific-Atlantic S. S. Co., 180 F.2d 866, 870 (2d Cir. 1950). If such steps had been taken the court could have edited out the inadmissible portions and admitted a redacted document containing only the impeachment or retraction. Having deprived the court of that opportunity, the Insurer cannot now raise the evidentiary point.

### The Admission of Unsigned Deposition

#### Transcripts

The Insurer next contends that the judgment should be set aside and a new trial ordered on the ground that Judge Pollack erroneously permitted the Bank to introduce over the Insurer's objection transcripts of depositions of three witnesses taken in Switzerland which did not bear their notarized signatures. These witnesses were Jean Jacques Larpin, the Bank's chief bookkeeper, Bernard Chapuis, a Swiss CPA associated with the accounting firm of Societe Fiduciaire Romande Ofor S. A. ("Ofor") and Claudio Muollo, a Milan CPA associated with the accounting firm of Peat Marwick & Fides S. A. Larpin had been asked by his superiors in late April 1970 to check entries in certain of the Bank's records for the purpose of determining whether there were irregularities as reported by Salerian to Benezra. Chapuis and Muollo headed teams of independent auditors called in by the Bank, after Salerian confessed to his making of numerous false entries, to make an audit in which they would determine the nature and extent of the irregularities revealed by the Bank's records and report their findings and recommendations as to how the accounts should be corrected.

There is no suggestion that the Insurer did not have a full opportunity to cross-examine the three witnesses when their depositions were taken in Switzerland. Indeed the depositions of two of them (Larpin and Muollo) were taken in mid-November 1971, at the instance of the Insurer. Although the Insurer had notice of the taking of the deposition of the third (Chapuis) in Geneva on November 22, 1971, as originally scheduled, its counsel chose not to attend. Nor is it contended that the transcripts of the depositions did not accurately reflect the witnesses' testimony. The transcripts

were certified as accurate by the reporter, a member of the staff of the Southern District Court Reporters who had been brought by the parties to Switzerland for the purpose of making a stenotype recording of the testimony. The sole objection is that each of the transcripts fails to bear the notarized signature of the witness in accordance with a stipulation and oral order of the court. The reason for the Bank's failure to obtain the witnesses' signatures was that due to a strike of transcribing personnel of the office of Southern District Court Reporters the depositions, which were taken in November 1971 in Switzerland, could not be transcribed and copies delivered to counsel for the parties until December 8, 1971, five days before trial began.

We agree with the Insurer that a timely objection to a deposition transcript on the ground that it fails to show that the witness was sworn, or fails to comply with requirements stipulated to by the parties in lieu of an oath (in this case that the transcript would bear the notarized signature of the witness), should be sustained and the transcript excluded. See Rule 32(b), F.R. Civ.P., 6 Wigmore, Evidence § 1824 (3d ed. 1940). Here, however, after initially indicating that it would not object, the Insurer interposed an objection at a time when it was too late for the Bank to cure the irregularity. Furthermore, any error in admitting the depositions was harmless, since the witnesses' testimony merely duplicated the substance of regular business records that were properly received in evidence.

Upon the commencement of trial on December 13, 1971, the Insurer's counsel, who had received unsigned transcripts of the depositions, pointed out to the court that he had "not received back from the plaintiff (Bank) the signed and sworn to depositions of any witness whose depositions we took in Switzerland." The court responded: "The Court: Signatures will be ordered waived, if that's your only concern because a mechanical delivery hasn't been made yet." The Insurer's counsel replied "Mr. Hart: *I wouldn't raise a fuss about that, your Honor.*" (Emphasis added). This response could reasonably be construed as indicating that the Insurer would not insist that the Bank forward the transcripts to Switzerland for signature and return before the end of the trial, then in progress. Valdez v. United States, 326 F.2d 598 (9th Cir. 1963). Having made this statement, the Insurer's counsel owed a duty to correct the impression thus conveyed and, if he desired to enforce his client's rights under Rule 32(b), F.R.Civ.P., to move promptly to suppress the depositions in accordance with Rule 32(d)(4).[7] Instead he waited until the first of the deposition transcripts was offered on December 16, 1971, whereupon he did indeed "raise a fuss," objecting to the depositions on the ground that they had not been signed and sworn to by the witnesses.

If the Insurer had indicated on December 13, 1971, that it would object to the transcripts unless they were signed and sworn to by the witnesses, the Bank could possibly have taken the steps necessary to forward the depositions to Switzerland for signature, notarization and return by December 22, 1971, when it rested. By the time the objection was interposed, however, it was too late to take such action.

Even if the Insurer had not waived its right to object to the failure of the dep-

7. "(d) *Effect of errors and irregularities in depositions.*

\*   \*   \*   \*   \*

"(4) *As to completion and return of deposition.* Errors and irregularities in the manner in which the testimony is transcribed or the deposition is prepared, signed, certified, sealed, indorsed, transmitted, filed or otherwise dealt with by the officer under Rules 30 and 31 are waived unless a motion to suppress the deposition or some part thereof is made with reasonable promptness after such defect is, or with due diligence might have been, ascertained."

ositions to bear the witnesses' notarized signatures, we are satisfied, upon our independent review of the record, that any error or defect in receiving their testimony would not have affected the parties' substantial rights and would therefore have been harmless. Rule 61, F.R.Civ.P., 28 U.S.C. § 2111. With minor exceptions their testimony amounted to nothing more than descriptions of information contained in underlying Bank records made available well in advance of trial to the Insurer and introduced into evidence. For instance, Larpin, the chief bookkeeper, described the nature of his investigation of the Bank's records, which he made in late April 1970 at the instance of his superiors to determine whether there were irregularities, and what he found. Similarly Muollo, the Peat Marwick auditor, and Chapuis, the Ofor auditor, explained the scope of their investigations, the procedures followed by them and their staffs in making their audits of the Bank's records, their findings (which were summarized in written reports furnished to the Insurer over one year prior to trial) and their recommendations as to what changes should be made in the accounts to correct the misinformation contained in them. Their testimony was to a great extent merely duplicative of the underlying records in evidence or that had been available to the Insurer prior to trial. Since their reports could be verified by reference to the underlying records, their credibility was not a substantial factor in the case.

### Other Contentions of Error

We have examined the Insurer's other contentions of error and find them to be without merit. Its argument that because Salerian did not succeed in his fraudulent scheme the Insurer should be excused from liability for resulting losses to the Bank defies logic.

■ Although it would have been preferable for the Bank to have furnished to the Insurer a copy of the IBM listing used in the preparation of one Schedule (Ex. 18, Settlement with 18 Numbered Accounts) used at trial, it appears that the underlying information had been furnished or made available to the Insurer. The claim that the witness Muollo was in New York on December 16, 1971, when his deposition was used at trial was not established. He apparently arrived two days later. When the Insurer's counsel did see him in the courtroom on December 22, 1971, after both sides had rested and were preparing to sum up to the jury, no effort was made to reopen the trial, which is not surprising, in view of the substance of his deposition testimony, already described. The denial of the Insurer's post-trial motion was well within the district court's permissible discretion. Welden v. Grace Line, Inc., 404 F.2d 76, 79 (2d Cir. 1968). There was also no abuse of discretion in allowing the Bank at the beginning of trial to amend its complaint to add an additional claim of $45,765 for the services of independent auditors in investigating the false and fraudulent entries made by Salerian and recommending steps to restore the integrity of the Bank's records. See Rule 15(a), F.R.Civ.P. Since the Insurer's counsel had been advised one month before trial of the Bank's intention to seek the amendment and thereafter examined the auditors at length upon taking their depositions (except for Muollo, whom the Bank offered to make available for further examination), no prejudice is shown.

The judgment is affirmed.