The People of the State of New York, Respondent, v
Manuel Jimenez, Appellant.

First Department, July 3, 1984

APPEARANCES OF COUNSEL

*Alan E. Kudisch* of counsel (*Fishman & Kudisch,* attorneys), for appellant.

*Donald J. Siewert* of counsel (*Roger Parloff* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

Alexander, J.

Manuel Jimenez stands convicted after jury trial of the crimes of robbery in the first and second degrees, grand larceny in the third degree and assault in the second degree. He appeals from this judgment of conviction, contending that he was deprived of a fair trial because a tape of a telephone call to the police 911 number was improperly received into evidence against him and because of prosecutorial misconduct. We agree that there should be a new trial, and accordingly, reverse.

The People's case sought to establish that the defendant and two accomplices robbed and assaulted the complainant, Joseph Babecki. The People's proof consisted principally of Babecki's testimony to the effect that on May 4, 1982, he went to a "gay" discotheque on 39th Street and First Avenue, known as "Stix" where he remained until closing, some four hours later. While there, he consumed 4 or 5 "weak" but "expensive" drinks. He indicated at trial, initially, that the closing time of the discotheque was 3:00 to 3:30 A.M. When confronted with his Grand Jury testimony, however, where he had stated that closing time was 4:00 to 4:15 A.M., he admitted to uncertainty and a lack of an ability to accurately estimate time or distance.

Babecki left the discotheque and sat on the curb. He was approached by two people who asked if he knew the location of any after-hours bars. He suggested a few, including one known as "The Anvil" which he frequented from time to time. He testified that a third person, whom he identified as the defendant, joined the group, and after some further conversation, they all left that location. Babecki rode in a white Volkswagen with John Orlando and Stanley Miller, the other two persons alleged to have participated in the robbery, and the defendant drove his own car.

Babecki testified that Orlando, who he said had a beard and was dressed in a white shirt, drove the Volkswagen. Miller, who was described as wearing a brown leather jacket, sat in the rear and Babecki sat in the front passenger seat. As they approached Bond Street and Broadway, Miller asked Orlando to stop the car so he could relieve himself. Babecki also got out of the car to stretch his legs and Orlando went back to the other car to talk to the defendant. According to Babecki, Orlando and the defendant then walked over to him and as they did so, Miller grabbed him from behind. Orlando then snatched chains from Babecki's neck and punched him in the face as defendant, who was armed with a tire iron, banged it against the building in a threatening manner. The assailants took Babecki's jewelry and his jacket, and sped off in their cars. As he started to walk away from the scene, Babecki realized he had dropped his cigarettes and went back to pick them up. He then noticed a telephone and dialed 911 to

report the incident. He gave a description of the three men and their automobiles. Defendant, Miller and Orland were apprehended shortly thereafter and the items that had been taken from the complainant were recovered from the Volkswagen in which Miller and Orlando were riding.

Defendant testified in his defense and denied having participated in any robbery. His version of the events differed significantly from that of the complainant. He testified that as the two cars approached Broadway and Bond Street, the Volkswagen stopped and he thought they had reached their destination. Instead, he saw the three people get out of the Volkswagen and appear to engage in a scuffle. Defendant testified that he grabbed a tire iron which he kept in the car for protection, having been mugged previously, and went to aid Orlando and Miller. As he approached them, he heard them telling the complainant to "get out of here, you f. . .g fag".

He asked Miller and Orlando what had happened. They told him that Babecki had made homosexual advances to Orlando and that had precipitated the scuffle. Defendant stated that Babecki walked away and the three of them, defendant, Orlando and Miller, got into their cars and left. They were apprehended by the police shortly thereafter and arrested.

The complainant's credibility was vigorously challenged in an exhaustive cross-examination during which a significant number of contradictions and inconsistencies were elicited. The issue of whether the defendant was a participant in the robbery and assault as contended by the complainant, or whether defendant merely joined the group after seeing a scuffle erupt and tried to help his friends disengage from an unwelcomed homosexual encounter was squarely presented by the conflicting testimony.

The People offered into evidence, over defense counsel's strenuous objection, a tape of the 911 call Babecki made to the police on the night of the incident. The offer was made to establish an "account of what the victim * * * reported at the time of the incident" and not for the truth of the content of the statement. Defense counsel argued that the tape was inadmissible hearsay and constituted a prior

consistent statement, which tended to corroborate the complainant's trial testimony as to the number of participants in the robbery and assault. The court acknowledged that the tape was hearsay, but nevertheless overruled the defense's objection and accepted the tape as a "predicate for police action". The court gave the jury an extended curative instruction on and an example of hearsay in order to illustrate the difference between hearsay "as opposed to what is the foundation of the offering of that conversation, which is what inspired the police to take certain action." The court concluded its instruction as follows: "[a]nd as the statement you're going to hear on the tape cannot be offered to prove what had occurred as stated by Mr. Babecki, but only to show that a telephone call was made, that Mr. Babecki had made certain statements and these statements prompted the police to take certain action." The jury was provided with a written transcript of the content of the tape, with an appropriate limiting instruction from the court as to its use, and the tape was then played for the jury. At the time the tape was offered and received into evidence, the complainant had completed his testimony and apparently had left the court. Thus, contrary to the thrust of the dissents' argument, the defendant had no opportunity to cross-examine the complainant in respect to this out-of-court statement.

Receipt of the tape into evidence was manifest error, not at all ameliorated by the court's curative instruction. The simple fact is that not only was the tape rank hearsay, it was totally irrelevant. No issue had been raised as to the "predicate for police action" nor was there any need to demonstrate through the tape "that Mr. Babecki had made certain statements and that these statements prompted the police to take certain action." Thus, the only relevance this tape had to this trial was as a prior consistent statement offered to bolster the credibility of the complaining witness and to corroborate his trial testimony as to how many persons actually participated in the alleged robbery. That such was its purpose and effect is graphically illustrated by the Assistant District Attorney's impermissible use of the content of the tape during his summation.

He argued that the complainant was correct in claiming at trial that there were three people involved in the robbery, and stated:

"Now, by the defendant's own admission, there were only three people involved, in addition to the complainant. It wasn't as if there was a passerby that joined later. It wasn't as if there was a fourth man in Mr. Jimenez' car that got away. It is only three. These people that had the encounter with the complainant, *and in this case, the complainant from the beginning indicated, and you can see his 911 call that —*

"MR. SUAREZ: Objection, your Honor.

"THE COURT: Overruled.

"MR. DINER: — *that he was robbed by three individuals.*" (Emphasis added.)

The Appellate Division, Fourth Department, in a strikingly similar situation has observed "[w]hile the court after objection ruled that it would not receive the testimony [of a radio call to the police of two men trying to break into a house through a side window] as proof of the truth of the statement asserted but merely to establish that the call was received, the statement was clearly hearsay and its prejudicial effect was reinforced by the opening of the Assistant District Attorney wherein he sought to impute guilt to defendant by virtue of the radio call" (*People v Donaldson,* 49 AD2d 1004, 1005). Here, the prejudicial effect of the receipt into evidence of the hearsay 911 call was reinforced by the use of the content of that call by the prosecutor to reinforce and bolster the complainant's trial testimony and thus "impute guilt to defendant by virtue of the radio call" (*People v Donaldson, supra,* p 1005).

Moreover, it is hornbook law that evidence of a prior consistent statement is inadmissible. A witness' in-court testimony may not be supported and bolstered by proof of a prior consistent statement made out of court. (*Crawford v Nilan,* 289 NY 444; *People v Davis,* 44 NY2d 269; *Moore v Maggio,* 96 AD2d 738; Richardson, Evidence [10th ed], § 519, p 510.) The limited exception to this rule is that prior consistent statements are admissible to counter a charge of

recent fabrication (see *People v Gilliam,* 37 NY2d 722, revg on dissent 45 AD2d 744; *People v Coffey,* 11 NY2d 142, 146). However, that exception has no application here because no charge of recent fabrication had been made or implied regarding the complainant's testimony (see *People v Williams,* 62 AD2d 1026). Moreover, even if such a recent fabrication charge had been made or intimated, the 911 tape would nevertheless have been inadmissible. It was made when the complainant had a motive to lie in retaliation for the rejection of his homosexual advances. Only those "prior consistent statements made at a time when there was no motive to falsify are admissible to repel the implication or charge" of recent fabrication (*People v Davis, supra,* p 277; *People v Williams, supra*).

The admission of this tape and the impermissible comments of the Assistant District Attorney were extremely prejudicial to this defendant. This jury deliberated for nearly two full days, during which time numerous requests were made to have testimony reread and for supplemental charges. The jury requested to be recharged on the elements of the crimes submitted and again for an additional charge on reasonable doubt during the morning of the second day of deliberation. That afternoon at approximately 2:15 P.M., the jury requested the transcript of the 911 tape and when told that it was not evidence, immediately requested that the tape be played again. This request was acceded to, but apparently without even the previous curative instruction being repeated by the court. At approximately 2:36 P.M., the jury announced that it had reached a verdict. Thus, it seems unmistakeably clear that this improperly received evidence played a significant role in bringing about the defendant's conviction. Even where the evidence may have been strong enough to support a guilty verdict had the jury believed the complainant, when it is not overwhelming as in the case at bar, and "the error may have influenced the jury's opinion of the credibility of the People's * * * witness, it cannot be said that the error was harmless (see *People v Crimmins,* 36 NY2d 230)." (*People v Williams,* 62 AD2d 1026, *supra.*)

We have considered the defendant's complaints of what he characterizes as prosecutorial misconduct. While the

other conduct of the Assistant District Attorney was far from exemplary, especially his refusal to promptly abide by the rulings of the court in respect to his questioning of the defendant's character witnesses and his persistent attempts at burden shifting during his summation, the court was alert to admonish the prosecutor and give appropriate curative instructions to the jury. Nevertheless, the over-all circumstances prompt us to reiterate that which was only recently said in *People v Dowdell* (88 AD2d 239, 243): " ' "a prosecutor is a quasi-judicial officer, who represents the People of the State, and is presumed to act impartially, solely in the interests of justice" * * * "and his primary duty is to see that justice is done and the rights of all — defendants included — are safeguarded" ' ."

Accordingly, judgment of Supreme Court, New York County (Luis Neco, J.), rendered July 5, 1983, convicting defendant, after trial, of robbery in the first degree, robbery in the second degree, assault in the second degree and grand larceny in the third degree, should be reversed, on the law, the judgment of conviction vacated and the matter remanded for a new trial.

SANDLER, J. P. (concurring). I am in general sympathy with Mr. Justice Silverman's view that prior consistent statements by a witness subject to cross-examination should rarely be a ground for reversal, and that there is much to be said for a more liberal attitude with regard to the admissibility of such statements. These general observations seem to me peculiarly unsuited to the issue presented in this case for reasons quite clearly set forth in the court's opinion.

In this case, the prior statement was presented to the jury in the dramatic form of a tape recording accompanied by a written transcript. The ground assigned for permitting the tape to be heard by the jury was palpably insufficient to justify the admission. As the case was tried, the improperly admitted tape recording might well have been the most decisive piece of evidence in the case. This was peculiarly the kind of situation in which it would be unrealistic to assume that the jury abided by the court's limiting instruction. Any doubt on that issue was surely dispelled by the fact that the trial assistant clearly used

the tape recording in a manner not sanctioned by the court's limiting instruction, and that inexplicably the trial court overruled the timely objection.

Under the circumstances disclosed, I am persuaded that the erroneous admission of the prior statement was prejudicial error, and that a reversal of the conviction is accordingly required.

SILVERMAN, J. (dissenting). I would affirm the judgment of conviction. The receipt and use of the tape recording of the victim's 911 call to the police should not require reversal (even if the court had not limited its use, as the court did).

A contrary holding overlooks the rationale of the hearsay rule, recent developments in liberalizing the hearsay rule and admissibility of prior statements made by a witness who is on the stand, as well as more basic principles of evidence and the interest of justice.

As a starting point "it is well to recall the principle, basic to our law of evidence, that 'All facts having rational probative value are admissible' unless there is sound reason to exclude them, unless, that is, 'some specific rule forbids' (1 Wigmore, Evidence [3d ed., 1940], p. 293). It is this general principle which gives rationality, coherence and justification to our system of evidence and we may neglect it only at the risk of turning that system into a trackless morass of arbitrary and artificial rules." (*Ando v Woodberry,* 8 NY2d 165, 167.)

In the present case, the objection to the record of the 911 call in which the victim had reported that he had been robbed by three people is apparently that this constitutes a prior consistent statement not falling within the limitations governing the use of such statements, and therefore, inadmissible as hearsay. In my view, the limitations on the use of prior consistent statements of a witness who is testifying and subject to cross-examination are little more than an administrative convenience to avoid spending a lot of time investigating the fact that the witness has said the same things on other occasions that he is now saying in court.[1]

---

1. Even as to prior consistent statements there is an exception for timely complaint: "In a prosecution for forcible rape, where the victim is a witness on the trial, the fact that

The major objection to hearsay, that the declarant is not subject to cross-examination, is obviously inapplicable; the declarant is right there testifying and subject to cross-examination.[2]

If the witness had said that he could not remember the incident, the 911 call would presumably be admissible as past recollection recorded, even though cross-examination would be completely frustrated by the witness' loss of recollection. It seems inconsistent to say that if the witness can recollect, and is thus subject to full cross-examination, then the receipt of the 911 call is reversible error. "The rule that the *present* recollection of a witness must be exhausted before a record of his *past* recollection may be admitted in evidence, though applied in New York and the Federal courts, has not been universally accepted or approved. There are times when the record of a past recollection, if its exists, is more trustworthy and desirable than a present recollection of greater or less vividness (Wigmore on Evidence [2d ed.], § 738), and that is clearly the case here." (*People v Weinberger*, 239 NY 307, 311.)

In this case, it is clear that the victim was robbed; the proceeds of the robbery were found in the possession of the codefendants. It is further clear that the victim was confronted by three men, one of them the defendant holding a tire iron. The issue is whether the defendant was one of the robbers or was there for some other purpose. The 911 call made by the victim within minutes of the robbery is unlikely to have been concocted. Indeed, it comes very close to being an "excited utterance" (Proposed Code of Evidence for the State of New York, § 803, subd [c], par [1]; *People v Caviness*, 38 NY2d 227, 230).

In *Letendre v Hartford Acc. & Ind. Co.* (21 NY2d 518) an action by an employer to recover on a fidelity bond, extrajudicial declarations made by plaintiff's employee were held admissible as affirmative evidence-in-chief against

she made a timely complaint is admissible to strengthen her credibility * * * The same principle has been said to authorize the admission of the timely complaint of the victim of a robbery or larceny. Wigmore, Evidence, § 1142." (Richardson, Evidence [10th ed], § 519.)

2. It appears clear "that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." (*California v Green*, 399 US 149, 158.)

defendant surety where the declarations were in writing and the declarant was available for cross-examination. The court said that "none of the classic dangers, which justify the hearsay rule, are present in this case" (at p 524). It added: "In reaching our conclusion, we have adhered to the views expressed by Chief Judge FULD in his concurring opinion in *Fleury* v. *Edwards* (14 N Y 2d 334, 341): 'The common law of evidence is constantly being refashioned by the courts of this and other jurisdictions to meet the demands of modern litigation. Exceptions to the hearsay rules are being broadened and created where necessary. [Citations.] Absent some strong public policy or a clear act of pre-emption by the Legislature, rules of evidence should be fashioned to further, not frustrate, the truth-finding function of the courts in civil cases'" (at p 525).

In *Vincent v Thompson* (50 AD2d 211, 224) the court said that the prior statement of a witness was admissible as substantive evidence against any party, even though it was hearsay against that party. The court said (pp 224-225):

"Clearly this was hearsay evidence to far as Parke, Davis was concerned, but, in its memorandum opinion in *People v Arnold* (34 NY2d 548, 549-550), the court observed 'that this court has in recent years emphasized that the hearsay doctrine has been too restrictively applied to exclude otherwise reliable evidence from the jury (see, e.g., *People v Brown,* 26 NY2d 88; *Letendre v Hartford Acc. & Ind. Co.,* 21 NY2d 518).' The underpinning for the rule excluding hearsay is that the purported utterer of the quoted statement cannot be subjected to cross-examination for purposes of casting full light on the information contained therein (see *Coleman v Southwick,* 9 Johns 45, 50). However, since the utterer of the original statement which is the source of the hearsay testimony complained of, Dr. Thompson, testified on the subject matter of the hearsay, as did those presenting the hearsay testimony * * * and the party raising the hearsay objection, Parke, Davis, had a full opportunity to cross-examine and confront all those witnesses at the trial, the hearsay rule should not be applied to bar the testimony. As Wigmore comments, 'the Hearsay rule, as accepted in our law, signifies *a rule*

*rejecting assertions, offered testimonially, which have not been in some way subjected to the test of Cross-examination'* (5 Wigmore, Evidence [3d ed], § 1362 [emphasis in original]) * * *

"Under the circumstances, the only way the hearsay evidence in question could be deemed inadmissible against Parke, Davis would be by a rigid and slavish adherence to a black-letter rule. We should not thus elevate form over substance in disregard of the requirements of justice."

In the present case, the damage to defendant in admitting the prior statement is considerably less than it was in either the *Letendre* case (*supra*) or *Vincent v Thompson* (*supra*). In *Letendre,* the extrajudicial declarations were contrary to and more damaging than the witness' testimony; in *Vincent v Thompson*, although the witness testified on "the subject matter of the hearsay", the only evidence supporting plaintiff on the point at issue was the extrajudicial statement made by the witness. In the present case, the witness, the victim of the crime, testified directly on the precise point and said the same thing in his testimony that he had said in the 911 call. (That the tape of the 911 call was introduced after the declarant had completed his testimony in no way frustrated defendant's right of cross-examination. The issue after all was not whether the declarant had said what the tape said he said; that was as nearly indisputable as any court evidence can be. The issue in dispute was whether declarant had been robbed by three men, one of whom was the defendant; and on that issue, declarant testified fully and was cross-examined.)

To exclude the evidence of the 911 call and to reverse the conviction because of its inclusion is to apply the rules of evidence to frustrate rather than further the truth-finding function of the courts (cf. *Fleury v Edwards,* 14 NY2d 334, 341).

I do not see how the interests of truth, justice and fairness were impaired by admitting the record of the 911 call or will be aided by excluding it.

I think the remaining claims of error are insubstantial.

Asch and Lynch, JJ., concur with Alexander, J.; Sandler, J. P., concurs in an opinion; Silverman, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, rendered on July 5, 1983, reversed, on the law, the judgment of conviction vacated, and the matter remanded for a new trial.