THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOHN DOWDELL, Defendant-Appellant.

First Department, July 29, 1982

### APPEARANCES OF COUNSEL

*Daniel Rosen* of counsel (*Howard B. Comet* with him on the brief; *William E. Hellerstein,* attorney), for defendant-appellant.

*Reginald C. Govan* of counsel (*Mark Dwyer* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

Ross, J.

The appeal now before this court, presents the question of when error, seemingly harmless, becomes prejudicial so as to deprive appellant of a fair trial? In this case, appellant's guilt was established by overwhelming evidence, and if this case had been tried without the numerous errors, hereinafter discussed, appellant's conviction would

have been readily affirmed. However, the cumulative effect of these several errors denied appellant a fair trial.

To begin, an examination of the facts is appropriate.

In the afternoon of February 2, 1979, Police Officers Charles Barberier and Matthew Carr were on anticrime patrol on the upper eastside of Manhattan. At approximately 3:40 P.M. the officers were traveling in their unmarked vehicle in a westerly direction on East 83rd Street, when they observed defendant and codefendant, Gregory Simmons, emerge from the five-story residential building located at 242 East 83rd Street. As the duo exited the building, the officers saw that defendant was carrying a 19-inch television, which was not covered or encased in any manner, and a white plastic bag, which upon subsequent investigation was found to contain two portable radios and two cameras. Simmons was observed to be carrying a dark plastic case which looked as though it housed a typewriter. Once on the street, defendant and his accomplice continuously glanced up and down and then headed eastward towards Second Avenue at a "very rapid pace".

These officers were aware that the area in which they were patrolling had a high rate of burglaries and decided to investigate. Officer Barberier exited the patrol car and followed the two on foot while Officer Carr continued to drive around the block. Upon reaching Second Avenue, the two suspects turned right. Upon arriving at the intersection of 83rd Street and Second Avenue, Officer Barberier saw the two standing in the street next to a stopped taxicab, the rear door to which was open. As the officer approached, he noticed that the merchandise, which the two had been carrying, was now located in the street near the curb. The white plastic bag was open, the officer looked in and saw several cameras and radios. He identified himself as a police officer and displayed his shield. In response to several questions, the defendants stated that the property belonged to them, that they had purchased the goods uptown but did not have any receipts for them. The officer next inquired as to defendants' whereabouts prior to this stop. One of them answered that they had just exited from a bus. The officer continued and asked whether they had just come from a building on 83rd Street. They

answered, "No". Knowing this to be untrue, the officer unholstered his weapon and placed the defendants under arrest for possession of stolen property.

The defendants were ushered into a nearby building and the facts of the arrest were then communicated to Officer Carr. Shortly thereafter, Carr arrived and searched the defendants. This search revealed that defendant possessed a screwdriver and some loose change. Simmons possessed a pocket calculator and several dollars. The defendants were then placed in the officers' vehicle and all returned to 242 East 83rd Street.

Once at that location both defendants were given the appropriate preinterrogation warnings. Thereafter, Officer Barberier entered the subject building in order to determine where the defendants obtained the property. After searching the entire building, this officer could not find any visible signs of a forced entry and returned to the street where the defendants were being guarded. Appellant was questioned first. He was unco-operative and was returned to the police car. Simmons was then questioned. In the vestibule of the building this appellant stated that he was unemployed, in need of money, that they had taken the merchandise "from the top floor apartment in the rear" and that "the door was open". Officer Barberier once again went to this apartment (5-C), and found that the door was locked. He then proceeded to the roof of the building and climbed down the fire escape. He noticed that the double-hung window to Apartment No. 5-C was partially opened. A metal gate, which was drawn across the interior of this window, was bent inward at the bottom. The officer was able to enter the apartment through this aperture. Once inside, he noticed that the apartment was ransacked. Officer Barberier found a telephone bill addressed to Regina McNamara, who was the lessee of the apartment. After leaving a note advising the tenant to call the precinct, the officer departed. Several days later the owner of the property identified the merchandise, which the defendants had in their possession when arrested, as belonging to her.

Appellant testified that on the day of this incident he and his wife had been present at a Family Court hearing. Simmons had accompanied them to the hearing. At ap-

proximately 2:00 P.M., the three left the court and headed toward the Lexington Avenue subway. On the way to the subway, defendant and his wife engaged in an argument, which continued after they had boarded the uptown local. The argument became more heated and, at the behest of Simmons, the two men got off the subway at the nearest stop — 77th Street. Appellant's wife continued her uptown trip. Once on Lexington Avenue, the two men walked north to 83rd Street and then easterly on this street to Second Avenue. Appellant asserted that neither he nor his companion entered the building located at 242 East 83rd Street. In addition, they were together at all times and never left each other's sight.

The appellant maintained that at Second Avenue they turned right, whereupon appellant decided to locate his wife in order to amicably settle their differences. They were in the process of entering a cab when they were approached by an individual, who did not identify himself as a police officer, but who merely lifted up his shirt and displayed a revolver. Appellant thought it best to answer the inquiries made by this individual, who later was identified as Officer Barberier. The officer asked if the nearby merchandise belonged to them. They answered no, and now, for the first time, noticed that there was a television set, a typewriter and a white plastic bag located approximately 10 to 15 feet behind them on the sidewalk. In response to the further questioning by this officer, appellant stated that he and codefendant Simmons had just gotten off the subway and had not exited from any nearby building. Appellant testified that during the ensuing search, Officer Carr discovered $5 and some change in defendant's pocket. Also, the screwdriver, which was allegedly found in appellant's pocket, was actually discovered by Carr lying on the vestibule floor of the building where the search was conducted. The remainder of appellant's testimony was consistent with the prior account given by the police officers and need not be repeated.

The evidence was certainly sufficient for a jury to convict appellant of the crime of burglary in the third degree; the crime which this jury did find appellant guilty beyond a reasonable doubt. However, on appeal, appellant urges

that this trial was so tainted with error that the judgment should be set aside. We agree.

The role of a prosecuting attorney during the course of a criminal trial, has recently been described as a "sensitive" one (*People v Galloway,* 54 NY2d 396, 399). Indeed, this court, in echoing past determinations, has stated that: " 'a prosecutor is a quasi-judicial officer, who represents the People of the State, and is presumed to act impartially, solely in the interests of justice' * * * 'and his primary duty is to see that justice is done and the rights of all — defendants included — are safeguarded. There is a positive obligation on his part to see that a trial is fairly conducted * * * He should be as zealous in protecting the record against reversible error as he is to present his case as forcibly as possible.' " (*People v Cavallerio,* 71 AD2d 338, 343.) With these tenets in mind, a majority of this court has concluded that the cumulative effects of the errors committed by the prosecutrix served to deprive appellant of a fair trial.

On the day before appellant's trial commenced, a *Sandoval* hearing was held. At this hearing, appellant's counsel moved to preclude the use of any of appellant's prior convictions. The court granted this motion in its entirety, noting that the prime reason for this decision was the similarity between the crime for which appellant was to stand trial and his past transgressions. The court specifically noted that prejudicial effect of any impeachment testimony would far outweigh the probative value of the evidence on the issue of credibility. Despite this ruling, the Assistant District Attorney, during her cross-examination of appellant, began questioning him concerning his prior use of aliases and using variations of his surname. Although defense counsel did not object to this line of questioning at trial, nor was an objection raised to other errors discussed *infra,* we have decided to consider these several errors, "[a]s a matter of discretion in the interest of justice" (CPL 470.15, subd 3, par [c]). In the setting in which these questions were asked, the obvious intent was to portray to the jury that appellant had some prior involvement with law enforcement authorities. Where the People have been completely precluded from inquiring into appellant's prior

bad acts and where the identification of appellant is not in issue, the tactic employed by this Assistant District Attorney can only be viewed as a vain attempt to avoid the consequences of the prior ruling and should be strongly condemned. (*People v Davis,* 63 AD2d 948.)

Immediately after the prosecuting attorney completed her inquiry into this area, she next delved into appellant's employment record. During the course thereof, this questioning occurred:

"Q. Mr. Dowdell, have you ever used narcotics yourself?

"A. No.

"Q. Have you ever been certified as a narcotics addict?

"A. No.

"Q. You are testifying that you never used either heroin or cocaine?

"A. No."

The effect of this probing was to call to the attention of the jury that this appellant was, in some manner, involved with drugs. Once this element of a person's background is injected as an issue, jurors could then reasonably equate this practice with some form of criminal involvement. Daily accounts in newspapers, periodicals and on television, remind us of the pervasiveness of drugs in our society. Chief Judge COOKE recently noted that in the past several years, we have witnessed "a virtual explosion in drug trafficking". (*People v McRay,* 51 NY2d 594, 602-603.) In addition, the Congress of the United States in enacting a long-range plan to combat drug abuse found that: "Drug abuse is rapidly increasing in the United States and now afflicts urban, suburban, and rural areas of the Nation * * * Drug abuse, especially heroin addiction, substantially contributes to crime." (US Code, tit 21, § 1101, subds [1], [3].) To a reasonable person, the words cocaine and heroin have become synonymous with crime. Once the prosecuting attorney began this questioning, she was, for a second time, attempting to circumvent the *Sandoval* proscription.

When the prosecutrix asked appellant whether he had ever been certified as a narcotic addict, this question, innocuous as it may seem, violated the confidentiality

assured drug dependent persons pursuant to the Mental Hygiene Law. At the time of this trial, the applicable statute (Mental Hygiene Law, § 23.05) provided that: "The certification of a drug dependent person to the care and custody of the office [of Mental Hygiene] * * * shall not forfeit or abridge any of the rights of any such drug dependent person as a citizen of the United States or of the state of New York * * * nor shall the facts or proceedings relating to the admission, certification, or treatment of any such drug dependent person be used against him in any proceeding in any court, other than a proceeding pursuant to the provisions of this article." The prosecuting attorney knew, even before commencing this questioning, that appellant was certified as a narcotics addict several years earlier. Her use of this evidence was contrary to the dictates of the Mental Hygiene Law which prohibited any inquiry into appellant's certification except where the questioning was done in a proceeding directly related to appellant's status or treatment. Surely appellant's criminal trial for burglary cannot fit into such a narrow exception. This cross-examination went beyond the bounds of fair play and was error.

In all criminal trials the Sixth Amendment guarantees that the defendant shall have the right "to be confronted with the witnesses against him". This right of confrontation was not afforded this appellant. During the course of the underlying investigation, codefendant Simmons admitted to the police that the two stole the articles from Apartment No. 5-C. This confession was redacted to delete any reference to appellant. Codefendant Simmons did not testify. However, the witnesses for the People testified as to this confession. As indicated, although the testimony of the police officers only referred to the codefendant, the trial presentation was such that the attempted redaction was meaningless. The effect of this was to deprive appellant of his constitutional right to confront his accusers. It cannot be said that, under the facts of this case, the likelihood of prejudice to appellant was negligible. Throughout this trial, the witnesses for the People testified that Dowdell and Simmons came out of the building together carrying the stolen merchandise. They then proceeded to Second

Avenue where they had stopped a taxicab. Both were simultaneously arrested, then searched and together they were transported back to the building, where they had exited. Then there is appellant's testimony in which he states that the two spent the day together and once off the subway, never left each other's sight and never entered the subject building. It is evident that the evidence, as presented by the People, inextricably linked these two in this criminal endeavor. The officers' testimony that the codefendant admitted that only he took the property pales in comparison to the testimony that appellant and codefendant were acting in concert throughout. The *Bruton* rule (see *Bruton v United States,* 391 US 123), "is designed to prevent conviction of a defendant based in part on the jury's knowledge of a codefendant's inculpatory confession — evidence which may weigh heavily in the mind of the jurors despite its legal inadmissibility against defendant". (*People v Safian,* 46 NY2d 181, 189.) The probability that this confession weighed heavily in the People's favor, at least in the minds of the jury, is great and should not have been utilized at this trial. Its use deprived appellant of his Sixth Amendment rights and constituted error.

And, the error in admitting this confession was further compounded by the prosecutrix' erroneous and prejudicial reference to it upon her summation. She stated: "It [the confession] is very important. Again it confirms the credibility of the police officers. In addition, it changes the case. Instead of having the evidence of having a burglarized apartment and recent exclusive possession of the fruits of the crime, you now have the defendant's own statement, the statement is sufficient to convict *both defendants* in view of all the other evidence." (Emphasis supplied.) Later, this Assistant District Attorney stated that "defendants admit to having been in the apartment." These statements had only one possible effect, to highlight to the jury the importance of this confession and to inform this panel that the confession could be used against the appellant when, in fact, it could not be so utilized. By calling the jury's attention to the confession in this manner, the prosecuting attorney erroneously and improperly nullified the prior attempt at redaction. The jury was thus encouraged to use

the codefendant's confession in determining the guilt or innocence of appellant in a situation where the confession was not to be used against him at all. The *Bruton* problem was intensified because defense counsel had no further opportunity to rebut this highly prejudicial assertion.

Other errors are evident in the Assistant District Attorney's summation, all requiring further comment. The recurrent theme in this summation was an attack of defendant's credibility. At the outset of her summation, the Assistant District Attorney clearly established the line of demarcation for the jurors. She stated: "[T]he issue in this case is very simply, one of credibility. Are you going to believe the Police Officers, or are you going to believe the Defendant Dowdell's account of how this incident occurred." From this jumping off point, the prosecutrix, rather than confining herself to the facts of the case and commenting fairly thereon, resorted to characterizing the defendant as a liar. This practice has been condemned (*People v Ortiz,* 51 AD2d 710), and in the interests of presenting a balanced view of this evidence, prosecuting attorneys should steadfastly avoid this tactic. In any event, the assistant initially informed the jury that appellant had an interest in the outcome of this case and because of this, "he has a definite motive to lie". From this point, the prosecutrix detailed the occasions when appellant lied to the jury. For example, she stated that appellant lied about his drug usage; he denied being a certified narcotics addict; he lied about narcotics usage; he lied about the amount of money found on him and he lied about his state of health. The prosecutrix made no attempt to convey this thought in an alternative form of speech, so as to temper her remarks. She pointedly argued, "the point is that he lies * * * Once he makes a lie, it's hard to keep up with that lie, it keeps tripping him up." Not bothering to stop here, the prosecuting attorney also pointed out that defendant lied to the jury. "[H]e lied to you on the stand. Didn't bother him. Why should it bother him, he has a lot at stake here. He has a motive to lie." The prosecutrix held nothing back in order to portray appellant in this light. This theory expanded with each verbal passage and was improper from its inception.

In comparing the testimony of appellant with that of the police officers, the prosecutrix vouched for the credibility of the officers by stating that they have no motive to lie; that they have been honest and consistent; that they did an outstanding, beautiful job.

Each of the afore-mentioned errors was, in all likelihood, harmless, especially in light of the overwhelming evidence against appellant and would not normally warrant this court's intervention on the interests of justice basis. However, the harmless error analysis is not unlimited. We cannot ignore the numerous errors that occurred at this trial and still label them "harmless". Ultimately, sufficient harmless errors must be deemed "harmful". This court is of the opinion that such a point has been reached and surpassed in this case. The cumulative effect of these errors was to effectively deny defendant a fair trial.

Accordingly, the judgment of the Supreme Court, New York County (McCOOE, J.), rendered on December 18, 1979, convicting appellant after trial by jury, of burglary in the third degree and imposing a sentence of 3 to 6 years' imprisonment, should be reversed, on the law and as a matter of discretion in the interest of justice, and the case remanded for a new trial.

SANDLER, J. (dissenting). As the court's opinion makes clear, appellant was convicted after a jury trial of burglary in the third degree on the basis of overwhelming, indeed conclusive, evidence.

Two police officers on anticrime patrol saw the appellant and his codefendant Simmons emerging one afternoon from a residential building, looking in each direction in a way meaningful to experienced police officers, and carrying in several bags an assortment of items that are the common fruits of an apartment house burglary. One officer followed the two on foot down the block, and approached them as they were hailing a cab, the bags having been placed on the ground near them. The defendants claimed that they had just bought the varied property in the two bags, although they had no receipts for any of them, and denied having emerged from the building which the officer had just seen them emerging from. They were arrested and

returned to the street in front of the building from which they had been seen to exit. A search of their persons disclosed a screwdriver and other items of a suspicious character.

After the *Miranda* warnings were administered, and in a separate conversation, Simmons disclosed to the officers the apartment in the building which had been burglarized. The officers thereafter confirmed that the apartment in question had been the subject of a burglary. The owner of the apartment identified as hers the property which the defendants had been carrying.

This was a very strong case indeed. If it were possible to strengthen the case still further, this was accomplished when appellant took the stand and gave testimony that can be fairly described as a tissue of transparent fabrications. The most important part of his testimony was his agreement that at the time the officer approached him and Simmons, the bags containing the property thereafter identified as stolen were on the sidewalk near where the appellant and Simmons were waiting for a cab. In short, the thesis presented by the appellant was that an unknown burglar or burglars, having ransacked the apartment in question over a block away, had somehow, without being observed by the appellant or his friend, abandoned their ill-gotten gains on the sidewalk at precisely the point that he and his companion were waiting for a cab, and that the police officers then decided to frame him and Simmons for the crime by falsely testifying that they had seen them exiting the apartment building with the bags, and falsely saying that he and Simmons had claimed ownership of the property.

Of course a conviction may not stand, no matter how strong the proof, if a defendant has been denied the fundamental right to a fair trial. (*People v Crimmins,* 36 NY2d 230, 238.) After a careful study of the trial record, I do not believe that what occurred in this trial can be fairly so characterized.

Undeniably error occurred during the cross-examination of appellant with regard to his prior use of narcotics. After the defendant had falsely denied that he had ever used

narcotics in answer to properly put questions that were not objected to, and after he went on to deny falsely having told two doctors in the course of separate physical examinations that he had used narcotics for years, the following questions by the trial assistant, belatedly but pertinently objected to, improperly referred to the contents of documents not in evidence, and were in any event excessive in the intensity and duration of the examination on this collateral issue. This aspect of the trial merits criticism.

In evaluating this episode, it seems to me that fairness requires acknowledgment that nothing clearly objectionable would have occurred if the defendant had not, as he thereafter admitted, given deliberately false testimony in the first place. Nor am I able to withhold some measure of sympathetic understanding to a trial assistant confronted by what she knew with certainty was intentionally false testimony by a defendant who had been given the benefit of an unusually favorable and unbalanced *Sandoval* ruling by the trial court, a ruling which precluded the District Attorney from inquiring into even one of the defendant's many criminal convictions, and which permitted a 30-year-old career criminal to present himself to the jury as though he were a person of unblemished background. In any event, by itself none of what occurred would justify our finding that the appellant was denied a fair trial.

Apart from this aspect of the case, the court's opinion does not identify a single error that was preserved for our review by objection. The opinion presents a litany of supposed, unobjected to, errors that the trial court was not given an opportunity to respond to and correct, if correction were appropriate, and most of which were not errors at all. The one clear additional error noted in the court's opinion, and the one or two additional arguable errors, could not singly or collectively have had the slightest impact on the verdict in this case, and accordingly do not remotely warrant our reaching any of them "[a]s a matter of discretion in the interest of justice". (CPL 470.15, subd 3, par [c].)

A major part of the court's opinion describes the prejudice purportedly sustained by the appellant as a result of evidence introduced at this joint trial that might not have been admitted if he had been tried separately. The most

central of the several flaws in this argument is that appellant made no motion for a severance and accordingly no issue appropriate for our consideration is presented. It would require a far more compelling situation than that disclosed by this record to persuade me that this court may properly consider as prejudicial error, in the absence of a motion to sever, the introduction of evidence correctly admissible in a joint trial that would not have been admissible in a separate trial.

Moreover the court's opinion overstates the prejudice sustained by the defendant because of the joint trial. The single piece of evidence admitted against the defendant in this case that might not have been admissible in a separate trial was the codefendant's redacted statement that he, and apparently he alone, had broken into the apartment and had stolen the property. Even as to that statement there is a strong case to be made that it would have been on balance helpful to the appellant if he had not testified, and had not given the testimony that he gave. Further the thrust of the appellant's testimony was that the police testimony was false from the beginning to the end, including by necessary implication the testimony that Simmons had admitted entering the burglarized apartment. It is surely improbable that the jury would have disbelieved the police with regard to every other aspect of the case but believed them as to the Simmons' admission. In short, appellant's testimony was designed to persuade the jury that he and Simmons were both innocent.

In the absence of a motion to sever, the whole issue discussed at length in the court's opinion could be properly considered only as part of a challenge to the adequacy of appellant's legal representation, which is in fact how appellant presented the issue. If in fact appellant's trial counsel had decided not to move to sever, knowing that the redacted statement would be admitted in the joint trial, and that appellant would testify as he did, an issue with regard to adequacy of representation might arguably have been presented. However we cannot determine on this record when appellant's counsel knew he would testify, and how he would testify, or whether the decision to testify was that of counsel or that of the appellant. Indeed we do not

know who made the decision not to move for a severance. From the appellant's testimony there emerges the picture of a man with unbounded if unrealistic confidence in his ability to use words to deceive others, as well as a man who viewed himself as the articulate spokesman for himself and his old friend, Simmons. Although this record does not permit a definitive judgment, there is at least a reasonable possibility that it was the appellant, not counsel, who decided that there should be no motion to sever, and the appellant, not counsel, who decided that he should testify.

In what seems to me the single clear error among those detailed in the court's opinion, the trial assistant was wrong to argue in her summation that the statement by the codefendant, to the extent to which it confirmed the fact of the burglary, could be considered as evidence against the appellant as well. No objection was made to this argument, and I can see no reason whatever for reaching the issue in the interest of justice. The argument was primarily defensive in character, the trial assistant being concerned lest the jurors infer from the redacted statement that only Simmons was guilty. It is unrealistic to suppose that this brief argument added so much as a featherweight to the strength of the case.

Much of the court's opinion focuses on the cross-examination of the defendant, in part correctly, as I have already indicated. This aspect of the trial cannot be understood without reference to the trial court's unusual *Sandoval* ruling. The appellant's previous criminal record embraced 21 arrests and 10 convictions, including one prior felony conviction for attempted robbery. The trial court granted in its entirety appellant's *Sandoval* motion and precluded the trial assistant from questioning the defendant with regard to any conviction, or the facts underlying any arrest or conviction, on the finding that all involved elements similar to the crime for which the appellant was on trial.

Appreciating as I do the concerns of the trial court that contributed to this ruling, it seems to me to have been palpably erroneous, as unfair to the District Attorney as some *Sandoval* rulings in other cases have seemed to me unfair to defendant. A variety of balancing options were available to the trial court that would have protected the

rights both of the District Attorney and the defendant. As suggested by the trial assistant, she could have been limited on cross-examination to eliciting the fact of previous convictions without being permitted to develop the character of the offenses. If so inclined the trial court could have limited the number of such convictions that could be so developed. Alternatively the trial court could have permitted the trial assistant to inquire specifically only as to one conviction, perhaps that for attempted robbery, and otherwise limited her cross-examination to eliciting only that the defendant had been convicted of several other crimes. The court's unbalanced ruling, permitting the defendant to testify as though he were a person of unblemished background, undoubtedly contributed to some of the excesses in the District Attorney's cross-examination, and perhaps also to the trial court's belated effort to restore the balance.

Preliminarily, this court's opinion cites as error several questions in which the District Attorney brought out that the defendant had used aliases on some occasions. No objection was raised to these questions, and I do not understand on what basis this court has determined that the issue should be considered in the interest of justice.

At the time this case was tried, no appellate court in this State, and certainly not this court, had ever held that questions as to aliases did not present an issue for the discretionary determination of the trial court. More recently the Appellate Division in the Second Department appears to have held that such questions are per se erroneous. (*People v Lindo,* 85 AD2d 643; *People v Jimenez,* 79 AD2d 1012, mod on other grounds 55 NY2d 895.) Even if this court were disposed to adopt that principle, a question as to which the court's opinion is silent, it seems to me unjustified for us to reach in the interest of justice several questions asked in good faith at a time when such questions were uniformly considered appropriate, which were not objected to, and which elicited answers that could not have affected the verdict in the case.

The court's opinion suggests that these questions wrongfully circumvented the *Sandoval* ruling and could have communicated to the jury, contrary to the trial court's ruling, that the defendant had been previously convicted of

crimes. However, nothing in the trial court's ruling excluded such questions, or could reasonably have been relied on by appellant to do so. The absence of objection confirms that appellant's counsel perceived no such violation. I do not see why this court should retrospectively expand a *Sandoval* ruling unbalanced in favor of the defendant to exclude still other questions that were not in fact interdicted and reach the issue in the interest of justice.

The situation here is wholly different from that addressed in *People v Sellars* (74 AD2d 551) in which questions as to aliases were carefully framed to specify particular dates and occasions on which the defendant in fact had been arrested for crimes which the trial assistant was precluded from inquiring about. Although anything is possible, it is a doubtful conjecture that a few general questions as to whether the appellant had ever used several aliases would have led the jury to infer that the aliases had been used in connection with arrests concerning which no specific question had been asked by the trial assistant.

Turning to the defendant's cross-examination with regard to prior narcotics usage, this phase of the cross-examination was initiated by three questions to which the appellant falsely answered that he had never used drugs, had never used heroin or cocaine, and had never been certified as a narcotics addict. No objection was made to any of these questions.

The question with regard to addict certification was clearly improper. The questions as to prior use of narcotics were of course appropriate unless, as suggested by this court, they conflicted with the trial court's *Sandoval* ruling. But nothing in the court's *Sandoval* ruling explicitly or by necessary implication precluded any questions as to prior narcotics use. And although it was wrong for the trial assistant not to have first inquired as to the propriety of these questions, the later rulings of the trial court strongly indicate that he did not interpret his ruling to prohibit general questions as to narcotics use. The absence of any objection that would have permitted the trial court to address the issue at its inception, confirming that appellant's counsel saw no breach, should be dispositive.

The defendant having falsely denied prior narcotics use, the trial assistant clearly had the right, subject to the discretion of the trial court, to pursue the issue at least to the extent of asking whether the defendant had not previously admitted substantial narcotics usage to two doctors in the course of physical examinations. (*People v Sorge,* 301 NY 198, 200-202.) As already indicated, I believe that much of the interrogation that followed the defendant's continued false denials was improper.

The most disquieting aspect of the court's opinion is its harsh condemnation of that part of the prosecutor's summation that addressed the issue of the credibility of the police officers and the credibility of the appellant. The criticism seems to me almost entirely unjustified. The opinion extends some passing judicial comments in particular contexts into a set of standards for prosecutorial summations that are unreasonably and severely restrictive, and that expand inordinately the already existing, and proper, distinction between that which is permitted to prosecutors and that which is permitted to defense counsel, and indeed to all other trial lawyers. It will inevitably be the source of confusion and error on the part of Trial Judges and prosecutors.

The realistic problem facing the trial assistant, as it was the problem confronting defense counsel, was that two very different versions of the event had been presented. Both could not be true. Nor could the two accounts conceivably be reconciled on the basis that somebody had been honestly mistaken. Either the police officers had given false testimony willfully and purposefully, or the appellant had done so. It was in short the familiar burden of the prosecutor to argue to the jury that the police officers had told the truth and that the appellant had lied.

As to the police officers, the trial assistant appropriately pointed out the inherent credibility of their testimony, that it conformed to common sense and experience, that the events described by them held together in a coherent way and were corroborated by objective facts, that they had no motive to lie or any interest in the outcome of the case. In response to attacks by defense counsel on the competence with which the arrest and investigation had been con-

ducted, she strongly and properly defended the officers as having performed their duties conscientiously and well, which in fact they had done on any objective view of this record.

The court is clearly wrong when it charges that the prosecutor "vouched for the credibility of the officers" by stating that they had no motive to lie and by arguing, with regard to events at which she had not been present, that the officers "have been honest and consistent; that they did an outstanding and beautiful job". The court is equally wrong in criticising the trial assistant's entirely correct statement, one used without objection from time immemorial, that the appellant "had an interest in the outcome of this case" and "has a definite motive to lie".

In evaluating appellant's testimony, it was the trial assistant's function, if the evidence provided a fair basis for the argument, to persuade the jury that his testimony was false, and under the circumstances that it was intentionally false. In this case virtually every aspect of the appellant's testimony provided abundant material for that argument. In every respect in which this court's opinion quotes the trial assistant as having argued to the jury that the appellant lied, the argument was squarely and solidly supported by the evidence. I do not believe that an objective reader of the trial record could doubt that the appellant in fact lied throughout his testimony.

Although this may not have been intended, the court's opinion appears to assert that a prosecutor may not in the course of a summation, no matter how fairly the argument is based on the record, argue to the jury that a defendant gave intentionally false testimony, that the defendant did so repetitively, that he showed a total contempt and disregard for the truth, that his testimony stamps him as a person prepared to lie whenever it serves his interests, and that he is wholly unworthy of belief. If the court in fact means what it said, difficult days are indeed ahead for those charged with the prosecution of crime.

It may be that the court's primary concern is not with the substance of the argument but with the prosecutor's choice of language; that all would have been well if the trial

assistant had used other expressions in lieu of the word "lie", which have the same meaning; that no fault would have been found if she had used such expressions as "prevaricate", "willfully deceive", "deliberately misstate", "concoct", "invent", "systematically falsify", and the like. I confess that I do not understand what there is about this commonly used word that creates a legally significant issue in its use in arguments to lay jurors who surely hear and use the word in the everyday concerns of their lives. Curiously, the offending word has been used for many years as boilerplate language in standard criminal charges, trial courts customarily instructing juries to consider, among other criteria in evaluating credibility, whether a witness had a "motive to lie". I am mystified by the process which transforms this long-approved instruction into error when used by prosecutors in summation in accordance with the precise intent of the instruction.

The word has been used by trial lawyers for generations if not for centuries. The principal caution of experienced trial lawyers is that its use is often tactically unwise because it may evoke sympathy for a witness so accused in the absence of very convincing evidence in the record that it has been appropriately applied. It is a strong word but not an inflammatory word. Although there are a scattering of cases in which appellate courts have expressed displeasure at its use by prosecutors (I am aware of none criticising its use by anybody else), I know of no case in which a conviction was reversed because of its repetitive use, without any objection that might have limited its use, in which the evidence so clearly justified the argument that was made and in which the guilt of the defendant was so conclusively established.

Let me state clearly that in my opinion, with unimportant exceptions, the trial assistant's comments on the truthfulness of the defendant were proper, were fully justified by the record, did not misinterpret the meaning of the evidence, and in no way exaggerated the pervasive deceitfulness that appeared in virtually every single word that the appellant uttered on the witness stand.

Accordingly, the judgment of the Supreme Court, New York County (McCooe, J.), rendered December 18, 1979,

convicting the defendant, after a trial by jury of burglary in the third degree, and imposing a sentence of 3 to 6 years' imprisonment, should be affirmed.

MURPHY, P. J. and CARRO, J., concur with ROSS, J.; SANDLER, J., dissents in an opinion.

Judgment, Supreme Court, New York County, rendered on December 18, 1979, reversed, on the law and as a matter of discretion in the interest of justice, and the case remanded for a new trial.