■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANTONIO ROMAN, Appellant.—Judgment of the Supreme Court, Bronx County (Ivan Warner, J.), rendered on March 9, 1984, convicting defendant, following a jury trial, of murder in the second degree and two counts of robbery in the first degree and sentencing him, as a second felony offender, to concurrent indeterminate terms of imprisonment of from 25 years to life and 12½ to 25 years, is unanimously reversed on the law and as a matter of discretion in the interests of justice and the matter remanded for a new trial.

Defendant Antonio Roman was convicted, following a jury trial, of murder in the second degree and other assorted crimes as the result of the death by gunshot of one Pedro Rodriquez. In that connection, the People's evidence demonstrated that on July 29, 1982, at approximately 7:00 P.M., Roberto Flores and his girlfriend, Anna Torres, were selling heroin on the corner of 181st Street and Daly Avenue in The Bronx when they were approached by defendant, with whom they had been acquainted some 13 and 5 years, respectively. Flores was a long time heroin user and had consumed both heroin and cocaine on the day in question. Defendant, who was in the company of another man unknown to Flores and Torres, appeared to be "desperate for money" and stated that he was searching for someone to rob. He displayed a .38 caliber revolver which he carried in a black pouch. At this point, Flores and Torres observed a drug transaction being conducted across the street. The purchaser was the deceased, Pedro Rodriquez. After the sale, Rodriquez went over to the side of an abandoned building, ostensibly to urinate. Defendant walked towards Rodriquez, removing the gun from the pouch as he did so, and then a shot rang out. Flores and Torres looked in the direction of the sound and noticed defendant, gun in hand, going through the pockets of the prone Rodriquez. Defendant thereupon ran off with his victim's wallet.

Although Flores and Torres were still present on the scene when the police arrived, they did not volunteer any information, and, indeed, they failed to mention that they were eyewitnesses until each had been arrested on unrelated

charges and apparently agreed to cooperate with the authorities in exchange for consideration with their pending cases. At trial, both Flores and Torres admitted to having prior criminal records. It should also be stated that the police discovered a man, subsequently identified as Rodriquez, lying on the ground near an abandoned building, his pants pockets having been turned inside out and his zipper open. Near the victim's leg was a leather pouch. In addition, the police were able to obtain a physical description of the perpetrator as being that of a male Hispanic, five foot seven or eight, weighing 160 to 170 pounds, with a medium Afro and a light beard. In his defense, Roman presented four alibi witnesses, consisting of his mother, his common-law wife, her son, and defendant's brother-in-law, who all maintained that at the time that the crime was committed, defendant was at his mother's home in Providence, Rhode Island, celebrating his stepson's birthday. Although these four people did not agree with respect to the details of the evening, they insisted that defendant had attended the festivities. Moreover, persons other than Roman and his four witnesses were purportedly at the party.

While the evidence at trial was sufficient to establish defendant's guilt beyond a reasonable doubt, and the jury was certainly warranted in rejecting the testimony of defendant's alibi witnesses, we believe that the improper statements by the District Attorney during summation had the cumulative effect of depriving defendant of a fair trial. Clearly, the crux of the People's case was based upon the two supposed eyewitnesses, Roberto Flores and Anna Torres, and the defense strategy not surprisingly involved attacking their credibility. Although the District Attorney's discussion of the credibility of the People's witnesses is appropriate where the defense places their veracity at issue (*People v Atson,* 139 AD2d 520; *People v Jefferson,* 136 AD2d 655; *People v Geddes,* 134 AD2d 279), his remarks in the instant case not only exceeded the bounds of fair comment but were permeated with improper vouching for the prosecution's witnesses (*see, People v Hansen,* 141 AD2d 417; *People v Clark,* 132 AD2d 704; *People v Arcarola,* 96 AD2d 1081; *People v Whitehurst,* 87 AD2d 896; *People v Dowdell,* 88 AD2d 239; *People v McKutchen,* 76 AD2d 934). Indeed, rather than simply assessing the proof introduced at trial, the District Attorney concentrated his summation on assailing the credibility of defendant's witnesses and attesting to that of his own witnesses. Moreover, he engaged in a flagrant appeal to the emotions of the jury and usurped both their function as finders of the fact and that of the court as

advisor of the law. Accordingly, the prosecutor delivered legal instructions with respect to interpreting the evidence and then proceeded to evaluate its weight and significance in relation to his own charge.

The District Attorney, for instance, stated to the jury his standard for ascertaining both credibility and intent. Thus, although he noted that "[a]t the end of the case, the Court, in its charge, will instruct you as to evaluating credibility of witnesses and tests that you can use, okay, to determine if someone is telling the truth", he didn't wait for the court's instruction and described his own criteria, as follows:

"For example, does a witness have any—does a witness who comes in here to testify have any relationship to the defendant? That's a test you can apply. Does the person have a relationship to one side or the other side? Okay. Close relatives. You've heard the expression 'Blood is thicker than water.' Does a witness, any witness who testified, does he have an interest in the outcome of the case. They don't want to see anything bad happen to their husband, to their son, to their stepfather.

"Does the story make sense that they tell? Do they remember the exact date of the party because the defendant was there or because the date July 29th, 1982 was Hector's birthday. That's when he needed the alibi for.

"Finally, ask yourselves is the story corroborated by other independent evidence? For example, birthday party. Take pictures of the birthday party. That might be an example of independent evidence, pictures or people outside the family. It's just the family here. This is a story. Is it corroborated—backed up—or is it just what they're saying?

"The reliability of the witnesses, they're all relatives. They're looking to help one of their own. Their demeanor on the stand. When they were cornered, I asked—I believe it was the brother-in-law—what time the defendant arrived and before that, he said that he lived there and then when he got backed in the corner, he said well, he he went out for a walk or something like that. That's part of how you evaluate whether a person is telling the truth: when you box them in, when you get them cornered, how you respond.

"Remember ladies and gentlemen, if you find that any witness has intentionally been untruthful on that witness stand, you as a jury have the right to disregard".

Defense counsel interjected a successful objection, but the District Attorney, unwilling to let the matter drop, persisted

by telling the jury that "[y]ou are the finders of the facts. You can disregard a person's entire testimony if you believe". Another objection, again sustained, ensued. The prosecutor, still not content, continued: "You listen to what the Judge tells you about if you believe a person has lied to you on the witness stand, what you have a right to do. I submit you have a right as the jury here to reject the entire witness' testimony and that's what I suggest that you do with the defendant's alibi defense, reject it in its entirety." He then contrasted the unreliability of the defendant's evidence with that presented by the People, which he characterized as "strong". Therefore, in reference to Anna Torres, he asserted: "No question who she saw, what she saw. She was positive. She knew this man for five years. There was no doubt in her mind. This isn't a question of a stranger to a crime, a lady seeing a guy run by who she never saw before. Here's an eyewitness that knows the defendant that's strong evidence."

After an objection by defendant's lawyer was sustained, the prosecutor urged the jury to "determine if that's strong evidence as opposed to a stranger. One eyewitness to a murder, not a stranger, but someone who knows the defendant, nothing against the guy, no motive to lie, no motive to lie against him. * * * No interest in the outcome of the case. She doesn't care if he's convicted or acquitted. She has nothing against him. She has no reason to lie." He inquired rhetorically whether the jury thought that "she'd come in here to commit perjury, to frame a innocent guy?" This theme of the People's witnesses lacking a motive to frame an innocent person was a recurrent one throughout the District Attorney's summation. "Why would she want to frame a friend of her husband's?" he asked again, observing that "[s]he could have blamed it on a stranger or an enemy." According to the prosecutor, Torres' testimony, if believed, was by itself adequate to convict defendant, but he had also provided a second eyewitness, Flores, and he proceeded to vouch for Flores as well. He noted that Flores had conceded taking drugs the day of the homicide and had also admitted to "doing business on the street". Does Flores' account, the District Attorney demanded, "sound like something just made up or does it make sense? Does it make sense?" He maintained that Flores "had nothing against Antonio Roman. He had no reason to lie about him. No reason —if he wanted to get him that night, he could have went [sic] to the cops, 'Hey, I know the guy that did the robbery; it's Antonio Roman.' He had no reason to. He was going to lie. He was going to frame Antonio Roman, that would be the perfect

opportunity to do it, but he has nothing against this man." Further, the prosecutor demanded, "[w]hy would he come into Court and frame Antonio Roman now? Why would he come here last week and frame an innocent? Why would he commit perjury? Why would he lie against his old acquaintance that he knew from the area from the same neighborhood?" In discussing the agreement which the People had made with Flores in return for his testimony, the District Attorney insisted that "[h]e received consideration for cooperating, for testifying. He didn't receive consideration for saying 'That's the man I saw do the shooting.' He received consideration for testifying truthfully." The prosecution, as it had with Torres, concluded that Flores' testimony, if believed, was sufficient, without more, to convict defendant.

The District Attorney reminded the jury that the victim had been a "healthy, living human being with a family", and, "in order to give an identity to the lifeless corpse", the People had called the deceased's brother to the stand. The prosecutor made another effort at arousing the prejudice of the jury by remarking that defendant had gone to Rhode Island "[b]ecause he had done something wrong in the Bronx and that's why he went up to Rhode Island. * * * He had family in Rhode Island. I submit he fled because of consciousness of guilt, because he had done something wrong and that's why it took six months for the police to find him, because he was up there." The District Attorney also didn't neglect to point out that another indication of defendant's consciousness of guilt was that defendant had endeavored to alter his appearance by cutting his hair. Returning to the no-motive-to-frame defendant subject, he speculated that "[i]f the cops want to frame Antonio Roman, they could have come up with a gun; they could have put finger prints on it. They could have said he confessed. They could have gotten more witnesses, if it was a frame-up, but they're not going to come in here and lie to you. They're not going to frame him. * * * If they wanted to frame him, they could have very easily framed him. Is all of this a big mistake? Are all of these witnesses lying? Is this a big frame-up? If you feel it's a frame-up and they're mistaken and it's the wrong man, then I submit it's your duty to find him not guilty and acquit him, okay, if you believe that. * * * But if you believe the testimony of the eyewitnesses after applying the tests that I've given you and I have suggested and you have reason to doubt or disbelieve his family, his alibi witnesses, then I suggest it's your duty to follow the law and convict the defendant." This highly improper statement was

succeeded by equally inappropriate advice to the jury regarding the factors they should consider in determining whether defendant possessed the requisite intent to commit an intentional murder, following which the District Attorney made the inflammatory comment that "I'm not apologizing for the witnesses here because it's Robert Flores the drug seller and Anna Torres the shoplifter and not Judge Flores or Doctor Torres or Professor Torres. Is that what's going to make the difference here, because of who they are? Because if that's so, it's because of who they are, then don't get shot on 181st Street and Vyse Avenue unless a doctor or a professor or a minister is a witness."

The foregoing excerpts provide a representative, although by no means exhaustive, litany of the improper and prejudicial remarks made by the prosecutor in the course of his summation. Indeed, there was scarcely a portion of that summation which was not in a similar vein. However, courts have consistently condemned such statements by a District Attorney that defendant's witnesses were liars whereas the People's witnesses were credible and, thus, had no reason to testify untruthfully (see, People v Arcarola, supra; People v Ricchiuti, 93 AD2d 842; People v Whitehurst, supra; People v Dowdell, supra). Particularly reprehensible is a prosecutor's attempt, as occurred herein, to advance his position by, in effect, placing the prestige of his office and that of the police department at issue by arguing that had the People desired to frame defendant, they could have done so more effectively (see, People v Hansen, 141 AD2d 417; People v McKutchen, supra), or that an acquittal would be tantamount to finding that the police had committed perjury (see, People v Schaaff, 71 AD2d 630), or by implying that if the jury did not believe the eyewitnesses because they were not model citizens, then that would somehow negatively impact on public safety (see, People v Bonaparte, 98 AD2d 778). Regardless of whether or not there were any other errors in the trial of the instant matter, a reversal of defendant's conviction is mandated based solely on the sheer cumulative effect of the numerous improprieties contained in the prosecutor's summation. Concur—Murphy, P. J., Carro, Milonas and Ellerin, JJ.