[607 NYS2d 523]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ELAINE LADOLCE, Appellant.

Fourth Department, February 4, 1994

## APPEARANCES OF COUNSEL

*Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria,* Buffalo *(Paul J. Cambria, Jr.,* and *Mary Good* of counsel), for appellant.

*Matthew J. Murphy, III, District Attorney* of Niagara

County, Lockport *(Thomas H. Brandt* of counsel), for respondent.

GREEN, J.

■ Defendant was convicted, following a jury trial, of murder in the second degree (Penal Law § 125.25 [1]). Because of several errors committed by the prosecutor and the trial court, we reverse the conviction and grant a new trial.

Chester Stawiasz was killed on November 7, 1989. His body was found five months later, buried in a concrete slab in the basement of the house shared by defendant, her boyfriend Paul Garland and Garland's son, Michael. At the time of his death, Stawiasz had been living with defendant and the Garlands at that house on Geneva Street in North Tonawanda. The victim was described as a slow and unkempt man. Several witnesses testified that he was verbally and physically abused, deprived of food and forced to sleep in a closet or a broken-down van in the back yard by defendant or Paul Garland. Prosecution witnesses testified that defendant was Stawiasz's chief tormentor, while defense witnesses and defendant pointed to Paul Garland as his principal abuser.

On April 18, 1990, defendant reported Stawiasz's death and the location of his body to the North Tonawanda police and they exhumed the body the following day. In her statements to the police, defendant also gave her account of the events leading up to the victim's death. Defendant recalled that Paul Garland told her that he was going to wash Stawiasz, the "scum bag." A short time later, defendant told police, she saw Garland carrying kettles of boiling water to the bathroom and heard Stawiasz moaning and complaining that the water was too hot. After a few minutes, defendant heard Paul urgently telling Stawiasz to "wake up" and saw Paul and Michael Garland dragging an unconscious Stawiasz from the bathroom. She speculated that Stawiasz had been scalded with boiling water, which had caused him to have a heart attack. Efforts to revive Stawiasz through CPR and artificial respiration were unsuccessful, and he died. Paul and Michael left for work and, when they returned, decided to bury the body in the basement. Defendant, Paul and Michael spent the next two days encasing Stawiasz in a concrete slab in the basement.

After the body was recovered and defendant gave her state-

ment to the police, Paul and Michael Garland turned themselves in to the North Tonawanda police. Paul was eventually charged with the murder and Michael was charged with hindering prosecution. After the Garlands' counsel spoke with the police, an arrangement was made with the Niagara County District Attorney granting Michael immunity from prosecution and allowing Paul to plead guilty to the misdemeanor of hindering prosecution. In exchange, both men agreed to testify at defendant's trial.

Defendant's first trial ended with a hung jury. According to a newspaper account, 11 of the jurors voted for acquittal.

Michael and Paul Garland were the chief prosecution witnesses at both the first and second trials. The Garlands gave a very different account of Stawiasz's death from the one defendant gave to the police. Paul and Michael Garland both recalled that Stawiasz died after defendant beat him repeatedly with an oversized drumstick over a two-day period. They stated that the final blows were struck by defendant to the right side of Stawiasz's head. Paul stated that, after the last beating, he assisted Stawiasz into the bathtub. When Paul went to check on him later, Stawiasz was hunched over and shaking. Paul and Michael laid him on the floor and attempted to revive him. When those attempts failed, the Garlands left the house. They left the body in the sitting room, covered with a blanket, until they returned from work several hours later. Defendant helped the Garlands to bury Stawiasz's body in concrete.

After deliberation the jury found defendant guilty of intentional murder.

# I

Defendant contends that numerous trial errors, viewed independently or in combination, served to deprive her of a fair trial. As a preliminary matter, we conclude that proof of defendant's guilt is not overwhelming, and that the doctrine of harmless error does not apply (see, People v Crimmins, 36 NY2d 230, 241). The central issue confronting the jury was whether Stawiasz was killed by defendant or by Paul Garland. There is no dispute that the body was concealed by defendant and the Garlands acting together. The only question was which of the residents of the house on Geneva Street caused Stawiasz's death. There was credible evidence supporting both versions of the murder. The proof supports the conclusion that

both defendant and Paul Garland abused and mistreated Stawiasz. The medical evidence is far from conclusive. The credibility of the Garlands, the prosecution's chief witnesses, is undercut by their obvious motivation to lie following defendant's statements to the police. In sum, this was a close case. The evidence was less than overwhelming. Therefore, we have no occasion to employ harmless error analysis *(see, People v Crimmins, supra; People v Grice,* 100 AD2d 419, 423).

Our conclusion that the collective errors in this case are not susceptible of harmless error analysis would be no different if the proof of defendant's guilt had been overwhelming. "The right to a fair trial is self-standing and proof of guilt, however overwhelming, can never be permitted to negate this right" *(People v Crimmins, supra,* at 238; *see also, People v Alicea,* 37 NY2d 601, 605). Harmless error analysis must always stop short of the point where the defendant's right to a fair trial is in peril. As the First Department observed in *People v Dowdell* (88 AD2d 239, 248): "Each of the afore-mentioned errors was, in all likelihood, harmless, especially in light of the overwhelming evidence against appellant and would not normally warrant this court's intervention on the interests of justice basis. However, the harmless error analysis is not unlimited. We cannot ignore the numerous errors that occurred at this trial and still label them 'harmless'. Ultimately, sufficient harmless errors must be deemed 'harmful' " *(see also, People v Jarrells,* 190 AD2d 120, 126; *People v Butler,* 185 AD2d 141, 145; *People v Walker,* 119 AD2d 521, 523; *People v Ortiz,* 116 AD2d 531, 534).

Reversal is warranted because, regardless of the quantum and nature of the People's proof, the threshold of reversible error was unmistakably crossed in this case. Even if the proof had been overwhelming, the cumulative effect of numerous errors deprived defendant of her fundamental right to a fair trial.

## II

### Defendant's Failure to Testify

■ Defendant did not testify at trial. Her version of Stawiasz's death reached the jury only through her statements to the police. The prosecutor, in his summation, invited the jury to take defendant's statements into the deliberation room and to read her version of the events with a critical eye, "slowly pick apart, dissect it." He then directed the jurors to "be the

ones to conduct *the cross-examination that we never got a chance to hear"* (emphasis added).

The obvious implication of the prosecutor's comments was that defendant failed to testify and thereby deprived the jury of an opportunity to test her version of the story. Contrary to the People's arguments, those remarks were highly improper and extremely prejudicial. A prosecutor's summation comments concerning a defendant's failure to testify is error of constitutional dimension *(see, People v Crimmins, supra,* at 237; *People v Gale,* 138 AD2d 401, 402).

The error might have been cured if the trial court had acted promptly to correct it *(see, People v Killingsworth,* 159 AD2d 985, 986, *lv denied* 76 NY2d 737; *People v Brooks,* 117 AD2d 972, 973, *lv denied* 67 NY2d 940). Regrettably, however, the court compounded the error. First, it gave an unrequested "no inference" charge. Absent a request by defendant, it is constitutional error to give such a charge *(see,* CPL 300.10 [2]; *People v Vereen,* 45 NY2d 856, 857). Second, the "no inference" charge given went beyond the plain and simple language of the statute. Rather than simply informing the jury that the fact that defendant did not testify is not a factor from which any inference unfavorable to the defendant may be drawn *(see,* CPL 300.10 [2]), the court engaged in a lengthy discussion of defendant's failure to testify. Not only did the Trial Judge dwell on the issue, but he speculated that defendant's decision not to testify was "probably made by counsel." That extended charge, in our view, "drew the jury's attention to the defendant's silence and implied that [her] decision not to testify was a tactical maneuver rather than the exercise of a constitutional right" *(People v Reid,* 135 AD2d 753, 754). The repeated emphasis on defendant's failure to testify magnified the prejudice created by the prosecutor's invitation to the jury to conduct "the cross-examination that we never got a chance to hear."

## The Indictment

The prosecutor and the trial court also committed mutually reinforcing errors in their remarks concerning the nature and function of the Grand Jury. During summation the prosecutor explained that the Grand Jury had convened in May 1990 "and they decided that Elaine LaDolce, after hearing evidence, should be charged with murder in the second degree." The trial court went much further in its charge. After

informing the jury that the fact that defendant had been indicted was not evidence, the court explained the nature of an indictment: "[T]his paper that I'm holding in my hand is the true bill of indictment. This paper is the result of a Grand Jury, and that is people chosen at random like you were chosen, but they sat upstairs and there were 23 of them sometime ago and they heard the prosecutor's witnesses. The defendant wasn't there nor was her counsel there. And after having heard the prosecution's witnesses they made a decision. And their decision was solely to this effect and this extent, that sufficient information had been presented to them to warrant their accusing Elaine LaDolce of the commission of these crimes."

The explanations by both the trial court and the prosecutor were unnecessary and possibly misleading (see, People v Fortt, 35 NY2d 921; People v Moran, 84 AD2d 753). There was no reason for the trial court to go beyond the standard instruction that an indictment is not evidence of guilt (see, 1 CJI[NY] 6.02) or to reinforce the prosecutor's improper and "obvious suggestion that 23 people 'upstairs' had already made a preliminary evaluation of defendant's guilt" (People v Payne, 187 AD2d 245, 247).

## The Testimony of the Garlands

■ Two serious errors were committed in connection with the testimony of the People's chief witnesses, Paul and Michael Garland. The first involves the prosecutor's duty to disclose the nature of the agreement between the District Attorney and Michael Garland. At trial, both the prosecutor and Michael Garland emphatically denied that Michael's cooperation was conditioned upon a favorable plea arrangement for his father. After the verdict, defendant moved to set aside the verdict pursuant to CPL 330.30 (1) on the ground that the prosecutor failed to disclose that Michael Garland refused to testify before the Grand Jury unless his father received an opportunity to plead to a reduced charge. In support of the motion, defendant submitted an article from the local newspaper detailing the terms of the Garlands' arrangements with the Niagara County District Attorney and an affidavit from defendant's former attorney, who asserted that the existence of the "package deal" had been confirmed to him.

When confronted with evidence supporting defendant's allegations that the Garlands had entered into a "package deal"

with the District Attorney in exchange for their testimony, the prosecutor abandoned his earlier denials and refused either to confirm or deny such an arrangement with his principal witnesses. The People took the position that defense counsel bore the burden of uncovering the existence and terms of any deals struck by the Garlands and that the prosecutor had no obligation to correct Michael Garland's testimony. The court denied the motion without a hearing on the ground that the jury had sufficient information about the promises exchanged for the Garlands' testimony.

We disagree with the positions taken by both the People and the trial court. The Court of Appeals has repeatedly held that the People, as part of their obligation under *Brady,* must disclose the existence of an agreement with a witness *(People v Steadman,* 82 NY2d 1; *People v Novoa,* 70 NY2d 490). "As a further incident of defendant's right to a fair trial, a prosecutor has an obligation to correct misstatements by a witness concerning the nature of a promise" *(People v Novoa, supra,* at 496; *see also, People v Steadman, supra).* We cannot agree with the trial court's conclusion that any failure to disclose accurately the terms of the agreements with the Garlands at trial was inconsequential. In our view, whether the Garlands entered into individual deals or into a package deal with the District Attorney is highly significant. Further, once any understanding has been reached between the prosecutor and a witness, "it is for the jury to determine how much value to assign it in terms of assessing the witness's credibility" *(People v Novoa, supra,* at 497). The prosecutor had a duty to disclose correctly the terms of the arrangements with the Garlands to permit the jury to make an informed assessment of their credibility.

■ The second error involving the testimony of the prosecution's main witnesses also concerns the jury's ability to make a proper assessment of credibility. We agree with defendant that she was entitled to an interested witness charge in connection with Paul Garland's testimony and that the charge, as given, was erroneous. The circumstances are nearly identical to those in *People v Jackson* (74 NY2d 787, 790), where the Court of Appeals held: "In light of this witness's obvious interest, the court should have told the jury, as had been requested, that the [witness'] testimony should be scrutinized carefully and a determination made as to whether any benefit he received affected the truthfulness of that testimony *(see,* 1 CJI[NY] 7.24). Such a clarifying instruction was particu-

larly important here because of the imbalance created by the court's erroneous instruction, to which counsel objected, that the informant's criminal past could be considered only insofar as it implicated his general credibility, thereby ruling out consideration of the more specific possibilities of bias and motive to falsify *(see, People v Bell,* 38 NY2d 116, 123)".

### III

■ In addition, we conclude that the prosecutor, during his summation, improperly characterized the defense witnesses as "throw away witnesses" *(see, People v Fernandez,* 82 AD2d 922), vouched for the credibility of his own witnesses *(see, People v Clark,* 195 AD2d 988) and misstated the People's burden of proof *(see, People v Antommarchi,* 80 NY2d 247, *rearg denied* 81 NY2d 759).

Defendant also argues that the People should have requested a *Ventimiglia* hearing; that the court erred in failing to conduct such a hearing; that the prosecutor improperly referred to her prior bad acts in summation; and that the court erred in failing to give limiting instructions regarding the use of that evidence. None of those arguments was preserved for our review *(see, People v McDowell,* 191 AD2d 515, *lv denied* 81 NY2d 1016; *People v Arnold,* 188 AD2d 1020, *lv denied* 81 NY2d 836). Nevertheless, because there must be a retrial, we point out that defendant is entitled to a prior ruling on the admissibility of evidence of prior bad acts *(see, People v Ventimiglia,* 52 NY2d 350, 362; *People v Heath,* 175 AD2d 562, 563).

In view of our decision, we do not reach the remaining issues raised by defendant.

Accordingly, defendant's conviction should be reversed and a new trial granted.

DENMAN, P. J., BALIO, LAWTON and BOEHM, JJ., concur.

Judgment unanimously reversed, on the law, and new trial granted.